395 S.E.2d 481

**STATE of West Virginia**

v.

**Elbert Wayne GILES, Jr.**

No. 19048.

Supreme Court of Appeals of West Virginia.

June 7, 1990.

Rehearing Denied July 24, 1990.

Frank W. Helvey, Jr., Public Legal Services Council, Charleston, for Elbert Wayne Giles, Jr.

Roger W. Tompkins, Atty. Gen., Joanna I. Tabit, Asst. Atty. Gen., Charleston, for State of W. Va.

BROTHERTON, Justice:

On the morning of February 8, 1987, relatives discovered the body of seventy-three-year-old Ann Woods on the bedroom floor of her home in Fayette County, West Virginia. Her throat had been cut, and, as a result, she died within minutes. The seventeen-year-old appellant herein, Elbert Wayne Giles, Jr., who was a neighbor of the victim, was arrested later that evening after he apparently confessed to killing Mrs. Woods.

On April 11, 1987, the Fayette County Circuit Court transferred Giles' case from juvenile to adult jurisdiction pursuant to W.Va.Code § 49–5–10(d). Giles' indictment on two felony counts was returned on May 13, 1987. Count 1 of the indictment alleged that, "On the __ day of February, 1987, in the said County of Fayette [he] committed the offense of 'sexual assault in the first degree' by unlawfully and feloniously engaging in sexual intercourse with Ann Woods and in so doing inflicted serious bodily injury upon [her] against the peace and dignity of the State." Count 2 charged that Giles had "on the __ day of February, 1987, ... committed the offense of 'Murder in the First Degree' by unlawfully, feloniously, willfully, maliciously, and deliberately slaying, killing, and murdering Ann Woods."

Giles was convicted of first-degree sexual assault and first-degree murder on July 8, 1987. Upon the jury's recommendation of mercy, he received consecutive sentences of fifteen-to-twenty-five years for sexual assault and life imprisonment for murder. His petition for appeal was granted by this Court on May 16, 1989, and the appellant now assigns several errors as grounds for the reversal of his convictions. Before addressing these issues, however, we will examine the circumstances which led to the defendant becoming a suspect in this case.

The chief investigating officer, Corporal Everette Steele, Jr., stated that on the day of the murder he interviewed many of the victim's relatives in order to obtain a list of people she had known. The names of Elbert Wayne Giles and Danny Hall were among those given, and Steele stated that he intended to question both Giles and Hall at some point in his investigation. However, Hall came to the sheriff's office of his own volition later that day and gave Steele a survival knife. Hall told Steele that he and Giles had been among the crowd of curious onlookers watching outside of Ann Woods' home earlier that morning. At that time Giles had handed Hall the knife because, according to Hall, Giles said "that the law didn't like to see a knife on a boy like [that]." Hall said that when he learned how the victim had been killed, he decided to bring the knife to the sheriff's office because it appeared to him that the knife had either rust or blood stains on it.[1]

Hall also related to Corporal Steele how he and Giles had spent the previous day on a drinking binge and that they both passed out at Hall's house at about 6:30 p.m. that evening. When Hall awoke in the early morning hours of February 8, 1987, at approximately 2:30 a.m., Giles was asleep on his couch. However, Hall claimed that two people later told him that they had seen Giles near Mrs. Woods' home sometime between 10:00 p.m. and 10:30 p.m. that night.

Corporal Steele took a statement from Danny Hall as well as Michael Allport, one of the two people who claimed they saw Giles near Mrs. Woods' home that night. Steele then sent two members of the Sheriff's Department out to locate Giles. Corporal Pete Lopez found Giles at a friend's house and asked Giles to come with him, telling Giles, "... why don't you step outside here with us a minute ... why don't you get your shoes, on and stuff, we're going to ride over to Fayetteville and talk to you a little bit." Giles agreed, but Lopez indicated in hearing testimony taken on April 11, 1987, that, "He [Giles] wouldn't have had any choice" and that if Giles had

---

1. At trial, the State did not contend that this knife was the murder weapon.

refused to come along, Lopez "would have had to take appropriate actions to see that [he] did take him into custody."

Giles was taken to a "road office," and placed downstairs in the presence of a deputy sheriff at 3:31 p.m. on February 8, 1987. Before the interrogation of Giles was initiated at around 4:00 p.m., the prosecutor reminded Corporal Steele that the seventeen-year-old Giles was permitted to contact a relative. Although he was apparently able to talk with either a family member or friend on the telephone, Giles was not able to reach his mother before he was questioned. Corporal Steele indicated that a deputy was asked to keep trying to contact her.

Corporal Steele told Giles that he would be questioned about the death of Ann Woods, and he read Giles the *Miranda* warnings from a card. Giles indicated that he would be willing to answer questions. *According to Steele, prior to his interrogation of Giles, he had not intended to arrest him and, at least for a while, if Giles had asked, Steele would have allowed him to leave.*[2] Steele stated, "He was just another suspect like some of the others on the list that I had that we were going to bring in, but the knife made me really curious about questioning him." However, twenty to thirty minutes into the interrogation, Steele said that he "felt like [Giles] definitely had something to hide, and at that point [he] was going to go ahead and arrest him."

Giles confirmed the events of February 7, 1987, in much the same manner that Danny Hall had related them to Corporal Steele. However, Giles denied ever leaving Hall's house that evening. Steele believed Giles was lying to him:

That's when I confronted him with the evidence that I had, that he had, in fact,

left Danny Hall's residence, which he denied time and time again, and for a long time he denied everything.

Then it got to a point where he asked me—he said—, he said, "just say that I say I did it—but I didn't. Say that I admit to it, I'm still going to jail?" And at that point *I told him, "Junior, I'm going to arrest you tonight whether you admit to it or not.* You've already lied to me. You have a reason for lying to me, and I'm going to arrest you before you leave here." And just shortly after that, I notice he started shaking and crying. (Emphasis added.)

Giles continued to deny that he had killed Mrs. Woods, so Corporal Steele told Giles "that being seventeen years old, one of these days he would reach the point where he couldn't, with this type of crime—he wouldn't be able to handle it." Steele stated that Giles "never really decided to tell the truth until I made him aware of the fact that I didn't think he could ever live with it"—"live with such a crime." Steele concedes that Giles "never did come right out and say, 'I killed Mrs. Woods.' I said, 'Why did you kill her?' And he said, 'I don't know.'" Steele maintains that Giles did not receive threats from him or anyone else in the office, "other than the fact that I was going to arrest him."

At Giles' March 12, 1987, transfer hearing, Steele stated that, although Giles insisted he didn't know why he killed Mrs. Woods, Giles consented to having the rest of the interrogation recorded. The first inculpatory statements were not recorded, however, due to technical difficulties. Steele told Giles that they would have "to go through this again," even though Giles maintained that he couldn't. Between the time that Giles made the first statements which were not recorded and the second statements which were, Giles apparently

2. At the March 12, 1987, transfer hearing, Corporal Steele was asked when he reached a point in the interrogation at which he no longer would have permitted Giles to leave if he had asked. Steele responded:

About the third or fourth time after—I gave him an opportunity to take back the lie several times about leaving Danny Hall's house. Had he taken that back and made a statement

that, "Yes, maybe I did. I think maybe I went down the road," I wouldn't have really felt like I had enough to arrest on. After asking four or five times and he refused to tell the truth, and I'm getting this from two other individuals, then I felt like he definitely had something to hide, and at that point I was going to go ahead and charge him.

asked Steele if he could help him, to which Steele responded:

I said, "I can't promise you one thing. The only thing that I can do for you is if one day"—and I put the emphasis—I said, "It may not ever come to this. One day down the road many years from now if you ever happen to come up for parole—maybe you will and maybe you won't—and anybody ever approaches me and asks me if you cooperated, I'll be able to tell them yes."

The second taped conversation began at 5:20 p.m. and, according to the transcript, it concluded at 5:30 p.m. By this time, Giles' mother had arrived at the sheriff's office, and she was permitted to speak with her son. After a search warrant and a juvenile petition were prepared in which Giles was charged with first-degree murder, a detention hearing was held at approximately 7:30 p.m.

At the conclusion of the transfer hearings held on March 12, 1987, and April 11, 1987, the court concluded that Giles' first oral statement to Steele was admissible for the purposes of transfer consideration. However, the second recorded statement was deemed inadmissible for the same purpose. The court found that Corporal Steele "admonished [Giles] that he would, in fact, help him sometime in the future if that occasion ever arose. He made an effort to impress upon the respondent that there was no certainty that such an occasion would arise that would give him an opportunity to make such a recommendation ... I do not believe that the officer's caveat in that regard was sufficient that this court should consider the second statement." [3]

■■■ On appeal, the appellant now argues that his confession was the result of the exploitation of his illegal arrest and, therefore, the trial court erred in admitting his inculpatory statements. Because of the appellant's juvenile status in this case, compliance with W.Va.Code § 49–5–8(d) is mandatory. In syllabus point 3 of *State v. Ellsworth J.R.*, 175 W.Va. 64, 331 S.E.2d 503 (1985), we held that:

Under W.Va.Code, 49–5–8(d), when a juvenile is taken into custody, he must immediately be taken before a referee, circuit judge, or magistrate. If there is a failure to do so, any confession obtained as a result of the delay will be invalid where it appears that the primary purpose of the delay was to obtain a confession from the juvenile.[4]

We have stated that, in the context of an arrest, " 'probable cause ... exists when the facts and circumstances within the knowledge of the arresting officer are sufficient to warrant a prudent man in believing that an offense has been committed.' Syllabus Point 7, *State v. Craft*, [165] W.Va. [741], 272 S.E.2d 46 (1980)." Syl. pt. 1, *State v. Drake*, 170 W.Va. 169, 291 S.E.2d 484 (1982). Mere suspicion does not meet the requirement of showing probable cause. *In the Interest of Moss*, 170 W.Va. 543, 295 S.E.2d 33, 39 (1982). The State concedes that there was no probable cause to arrest Giles when he was taken in for questioning. For this reason, however, the State argues that Giles was not actually in custody and the sheriff was not required to present Giles to a judicial officer prior to obtaining his confession during the ensuing interrogation.

A similar argument was advanced by the State in *In the Matter of Mark E.P.*, 175 W.Va. 83, 331 S.E.2d 813 (1985), in which the sixteen-year-old defendant was brought in by police for questioning in connection with the murder of a woman who had been burned to death. The juvenile, who did not want his parents present during questioning, was read the *Miranda* warnings and

---

**3.** The court reserved a ruling on the admissibility of these statements at trial. On the second day of the trial, however, the court again found the first oral statement admissible and the second recorded statement inadmissible without elaborating on these findings.

**4.** In *State v. Ellsworth J.R.*, 175 W.Va. 64, 331 S.E.2d 503, 509 (1985), we stated that "[o]nce such custodial arrest of a juvenile has occurred, his right to be immediately taken before a judicial officer arises under W.Va.Code, 49–5–8(d)." We also noted the language of W.Va.Code § 49–5A–2, which states that "[a] child who has been arrested or who under color of law is taken into ... custody ... shall be forthwith afforded a hearing."

given a form with the heading "YOUR RIGHTS," which he initialed, indicating that he understood his rights. Mark E.P. also signed a waiver of his right to have an attorney present during questioning. Shortly thereafter, he made an oral confession, admitting his presence at the crime scene, but blaming the killing on his co-defendant, John A.L. After the confession was reduced to writing and signed, Mark E.P. was taken before a magistrate and an arrest warrant was issued. John A.L. was subsequently arrested pursuant to a warrant obtained as a direct result of Mark E.P.'s statements. *Id.* 175 W.Va. at 86, 331 S.E.2d at 816.

Both juveniles challenged the admissibility of their statements on appeal. Mark E.P. argued that when he was taken in for questioning by the police, he was "in custody" within the meaning of W.Va.Code § 49–5–8(d) and he was entitled to its protections and should have been immediately presented to a judicial officer. John A.L. argued that because he was arrested pursuant to a warrant, the requirements of W.Va.Code § 49–5–8(d) applied to him with even more force. *Id.* 175 W.Va. at 90, 331 S.E.2d at 820–21.

In *Mark E.P.*, we discussed the State's argument in *Ellsworth J.R., supra* 175 W.Va. at 71, 331 S.E.2d at 509–10, that prompt presentment to a judicial officer is not required when probable cause to arrest does not exist and the juvenile agrees to accompany a law enforcement officer to be questioned.

Even if we were to accept the State's argument that there was no probable cause for the juvenile's arrest and he had agreed to accompany the police to the station, *a written confession taken under these circumstances would not necessarily be valid.* The validity of such a confession, independent of the age restrictions in W.Va.Code, 49–5–1(d), will turn on the custodial circumstances as we have outlined in *State v. Stanley,* [168] W.Va. [294], 284 S.E.2d 367 (1981). In *Stanley,* we followed *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and concluded that where a suspect is not free to leave the officer's place of questioning, then an illegal detention has occurred and a confession obtained under such circumstances, even though preceded by *Miranda* warnings, would be invalid unless there was a break in the causal connection between the illegal detention and the confession. (Citations omitted.) (Emphasis added.)

Ultimately, this Court refrained from analysis under the standards set forth in *Ellsworth J.R.* due to an inadequate factual record which did not reveal either the circumstances under which the questioning occurred or whether Mark E.P. was told that he was free to leave. *Id.* 175 W.Va. at 91, 331 S.E.2d at 822. The record also failed to disclose how long John A.L. was in custody before he was taken before a magistrate. Both cases were remanded for further proceedings.

■ In the case now before us, the facts contained in the record are sufficient to convince this Court that, with or without probable cause, Giles had effectively been "taken into custody" for the purposes of W.Va.Code § 49–5–8(d) when he was picked up and delivered to the sheriff's office for questioning. In syllabus point 1 of *State v. Muegge,* 178 W.Va. 439, 360 S.E.2d 216 (1987), we stated that "[a]n arrest is the detaining of the person of another by any act or speech that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest." While Giles may have accompanied the deputies to their office "voluntarily," it is apparent that he was never informed that he had a choice. In fact, Corporal Lopez's testimony at the transfer hearing made it clear that Giles had no choice but to come with them.

■ Giles was not told that he was under arrest, but the manner in which he was treated certainly gave the appearance that he was being arrested. Upon arriving at the sheriff's office, he was placed downstairs where, after unsuccessfully attempting to telephone his mother, he was told he would be questioned about the death of Ann Woods. Giles was read the *Miranda* warnings from a card and he agreed to be

questioned.[5] However, Giles was never told or given the impression that he was free to leave. Shortly thereafter, during his interrogation, Corporal Steele became convinced that Giles had "something to hide" and Steele then told Giles that he would be arrested regardless of whether he confessed to the killing. It was at this point that Giles made the first of two inculpatory statements. The first, which was not recorded, was described by Corporal Steele as "a much better confession." In the second recorded statement it was difficult to understand Giles, who was crying and shaking by that time.

When Giles was taken into custody and questioned, he was entitled to a "written statement explaining [his] right to a prompt detention hearing, his right to counsel including appointed counsel if he cannot afford counsel and his privilege against self-incrimination." W.Va.Code § 49–5–8(c) (1986). The sheriff's department obviously failed to comply with this statutory requirement.

The prompt presentment requirement set forth in W.Va.Code § 49–5–8(d)[6] was also clearly violated in this case. In *State v. Mays*, 172 W.Va. 486, 307 S.E.2d 655 (1983), this Court established "a clear rule that police investigatory interrogations without presentment to a magistrate are allowable only when the suspect is expressly informed that he is not under arrest, is not obligated to answer any questions and

is free to go...." *Id.* 172 W.Va. at 489, 307 S.E.2d at 658. None of these prerequisites to a permissible investigation were present in this case.

 Having found that Giles was illegally detained for the purposes of investigatory questioning, we now conclude that his subsequent confessions were the product of the exploitation of this illegal arrest. In syllabus point 2 of *State v. Stanley*, 168 W.Va. 294, 284 S.E.2d 367 (1981), this Court declared that:

A confession obtained by exploitation of an illegal arrest is inadmissible. The giving of *Miranda* warnings is not enough by itself, to break the causal connection between an illegal arrest and the confession. In considering whether the confession is a result of the exploitation of an illegal arrest, the court should consider the temporal proximity of the arrest and confession; the presence or absence of intervening circumstances in addition to the *Miranda* warnings; and the purpose or flagrancy of the official misconduct.

 Similarly, in syllabus point 3 of *State v. Canby*, 162 W.Va. 666, 252 S.E.2d 164 (1979), we held that the "[e]xclusion of a confession obtained as a result of an illegal arrest without a warrant is mandated unless the causal connection between the arrest and the confession has been clearly broken." We can find no such clear break in the causal connection between the arrest and the confession in this case. In

---

**5.** In syllabus point 1 of *State v. Ellsworth J.R.,* 175 W.Va. 64, 331 S.E.2d 503 (1985), this Court stated:

" '[Subject to the provisions of W.Va.Code, 49–5–1(d),] [t]here is no constitutional impediment which prevents a minor above the age of tender years solely by virtue of his minority from executing an effective waiver of rights; however, such waiver must be closely scrutinized under the totality of the circumstances.' Syllabus Point 1, as modified, *State v. Laws,* 162 W.Va. 359, 251 S.E.2d 769 (1978)." Syllabus Point 3, *State v. Howerton,* 174 W.Va. 801, 329 S.E.2d 874 (1985).

**6.** West Virginia Code § 49–5–8(d) (1986) provides in part:

A child in custody must immediately be taken before a referee or judge of the circuit court and in no event shall a delay exceed the next succeeding judicial day: Provided, That if

there be no judge or referee then available in the county, then such child shall be taken immediately before any magistrate in the county for the sole purpose of holding a detention hearing. The judge, referee or magistrate shall inform the child of his right to remain silent, that any statement may be used against him and of his right to counsel, and no interrogation shall be made without the presence of a parent or counsel. If the child or his parent, guardian or custodian has not retained counsel, counsel shall be appointed as soon as practicable. The referee, judge or magistrate shall hear testimony concerning the circumstances for taking the child into custody and the possible need for detention in accordance with section two [§ 49–5A–2], article five-A of this chapter. The sole mandatory issue at the detention hearing shall be whether the child shall be detained pending further court proceedings....

fact, within a short span of approximately two and a half hours, Giles was seized without probable cause, improperly given the *Miranda* warnings,[7] and told that he would be arrested whether or not he confessed in the course of an investigatory interrogation best described as an "expedition for evidence in the hope that something might turn up...." *Brown v. Illinois*, 422 U.S. at 605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428. There were no "significant intervening events" between the seizure and the subsequent statements which free those statements from the taint of the illegal police conduct. For this reason, we find that the lower court committed reversible error when it failed to exclude the appellant's inculpatory statement.

Although we reverse Giles' convictions on these grounds alone, we wish to briefly address a problem which is brought to this Court's attention with increasing frequency. As we noted earlier in this opinion, Giles was convicted of both first-degree murder and first-degree sexual assault. However, on appeal Giles argues that his first-degree murder conviction was based upon a felony-murder theory of the case and that this felony-murder conviction bars conviction for the underlying enumerated felony of first-degree sexual assault.

First, we note that Giles' indictment charged that he "committed the offense of 'Murder in the First Degree' by unlawfully, feloniously, willfully, maliciously and deliberately slaying, killing and murdering Ann Woods." However, a review of the record reveals that it was clearly the intention of the State to attempt to convict Giles of felony-murder, and thus not have to prove premeditation or malice, necessary elements of the other category of first-degree murder. At one point during an *in camera* discussion of proposed jury instructions, the prosecution stated:

> The State's position on this is, we were going forward on a felony approach, and since we're doing that, we don't have to prove the element—the traditional elements of premeditation and malice. *We only have to prove that during the commission of or intent to commit certain enumerated offense, that the defendant killed somebody.* (Emphasis added.)

The jury received a first-degree murder instruction to the effect that "murder by poison, lying in wait, imprisonment, starving, or by willful, deliberate and premeditated killing, or in the commission of or attempt to commit arson, sexual assault, robbery or burglary, is murder in the first degree," and was told that "murder in the second degree is any unlawful killing of a

---

**7.** However, properly administered *Miranda* warnings will not necessarily "purge the primary taint" of the illegal seizure of a person. In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the United States Supreme Court rejected the Illinois court's adoption of a per se rule that *Miranda* warnings in and of themselves broke the causal chain so that any subsequent inculpatory statement, even one induced by the continuing effects of an unconstitutional custody, was admissible so long as it was a voluntary statement and not coerced in violation of the Fifth and Fourteenth Amendments.

If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. See *Davis v. Mississippi*, 394 U.S. 721, 726–727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969). Arrests made without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedi-

ent of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a "cure-all," and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to "a form of words." See *Mapp v. Ohio*, 367 U.S., [643] at 648, 81 S.Ct. [1684] at 1687, 6 L.Ed.2d 1081, 84 A.L.R.2d 933.

It is entirely possible, of course, as the state here argues, that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality. But the Miranda warnings, *alone* and per se, *cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited.* See *Westover v. United States*, 384 U.S. 436, 496–497, 86 S.Ct. 1602, 1639, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966). *Brown v. Illinois*, 422 U.S. at 603–03, 95 S.Ct. at 2261, 45 L.Ed.2d at 426–27. (Footnote omitted).

person with malice." With regard to felony-murder, the court more specifically instructed the jury that "the crime of murder in the first degree is committed if the homicide occurs accidentally or otherwise during the commission or the attempt to commit arson, sexual assault, robbery or burglary. In such cases the State is not required to prove malice or premeditation or that the defendant had any specific intent to kill the victim."

From a review of its closing argument, it is obvious that the prosecution relied heavily upon the felony-murder theory of the case:

[Y]ou heard the Court instruct you about what is called felony murder. [I]f a person, while committing or attempting to commit, arson, sexual assault, burglary or robbery, accidental or otherwise kills a person, he is guilty of felony murder which is murder in the first degree.

The Court further instructed you that in a felony murder situation, the State does not have to prove premeditation [or] malice. The State merely has to prove that the defendant was committing, as in this case, a sexual assault, and then while committing the sexual assault, someone died. [L]et's assume for the sake of conversation that the defendant had no intention of killing Anna Woods when he held his knife to her throat, but that his foot slipped and he fell to the floor and he cut her throat and he killed her.

Now, ... that's clear that there's no premeditation there, there's no malice there, but the fact is that under the law ... it is what's called felony murder. He sexually assaulted her, and during the sexual assault, he killed her. He's guilty of first degree murder.

And felony murder has nothing to do with intoxication, because the State doesn't have to prove premeditation. [Defense counsel] talked with you quite a bit about the issue of intoxication. He said that if you did find, after considering all the evidence, that the defendant had consumed alcohol to such an extent that his ability to deliberate, premeditate, to plan, was impaired, that he was so

drunk he couldn't form an intent, then you could only find him guilty of second degree murder.

[T]hat argument flies full of mistakes.... The State does not have to prove malice in a felony murder.

[T]he fact that maybe there wasn't premeditation—maybe he was too drunk to form the premeditation, that doesn't make any difference. He raped her, he killed her. It's first degree murder.

■ In returning its verdict, the jury found Giles guilty of both first-degree sexual assault and murder in the first degree with a recommendation of mercy. In syllabus point 8 of *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983), this Court stated that "[d]ouble jeopardy prohibits an accused charged with felony murder, as defined by W.Va.Code § 61–2–1 (1977 Replacement Vol.), from being separately tried or punished for both murder and the underlying enumerated felony." In *Williams*, we held that double jeopardy principles are violated by separate trials for the greater offense of felony-murder and the lesser included offense of robbery, which was the underlying felony for purposes of the felony-murder conviction.

■ In spite of the State's argument to the contrary, we fail to see why those same double jeopardy principles would not be violated in this case. Sexual assault would be the underlying enumerated felony, or a lesser included offense, if indeed the defendant's first-degree murder conviction was based upon felony-murder. If Giles was found guilty of first-degree murder because the jury believed that he committed murder while "in the commission of or attempt to commit ... sexual assault," and that would certainly seem likely, then his separate conviction and punishment for first-degree sexual assault violated the double jeopardy principles found in our federal and state constitutions. U.S. Const. Amend. V; W.Va.Const., art. 3, § 5.

■ To alleviate the confusion caused by verdicts such as the one rendered in this case, we conclude that, in a prosecution for first-degree murder, the

State must submit jury instructions which distinguish between the two categories of first-degree murder—willful, deliberate, and premeditated killing and felony-murder —if, under the facts of the particular case, the jury can find the defendant guilty of either category of first-degree murder. When the State also proceeds against the defendant on the underlying felony, the verdict forms provided to the jury should also reflect the foregoing distinction so that, if a guilty verdict is returned, the theory of the case upon which the jury relied will be apparent.

For the foregoing reasons, the appellant's convictions are reversed.

Reversed.