516 S.E.2d 15

**In re JAMES L.P., a child under the age of eighteen (18) years.**

**State of West Virginia, Plaintiff Below, Appellee,**

v.

**James L.P., Defendant Below, Appellant.**

**No. 25343.**

Supreme Court of Appeals of West Virginia.

Submitted March 25, 1999.

Decided April 22, 1999.

Zoe A. Shavers, Esq., Theresa R. Chisolm, Esq., Charleston, West Virginia, Assistant Public Defenders, Attorneys for appellant.

Darrell V. McGraw, Jr., Esq., Attorney General, Barbara H. Allen, Esq., Managing Deputy Attorney General, Charleston, West Virginia, Attorneys for appellee.

PER CURIAM:

In the instant case, the appellant, James L.P.,[1] appeals a May 11, 1998 order of the Circuit Court of Kanawha County. This order reaffirmed previous orders transferring the appellant from the circuit court's juvenile jurisdiction to the court's adult criminal jurisdiction—to face a murder charge.

The issue before this Court is whether the Circuit Court of Kanawha County committed reversible error in ordering the transfer.

■■■ In reviewing orders in juvenile-to-adult-jurisdiction transfer proceedings, we apply the deferential, "clearly erroneous" standard of review to factual findings by the circuit court; we review the circuit court's legal conclusions under the non-deferential, "*de novo*" standard. As we stated in Syllabus Points 1, 2 and 3 of *In the Matter of Steven William T.*, 201 W.Va. 654, 499 S.E.2d 876:

1. " 'Where the findings of fact and conclusions of law justifying an order transferring a juvenile proceeding to the criminal jurisdiction of the circuit court are clearly wrong or against the plain preponderance of the evidence, such findings of fact and conclusions of law must be reversed.· *W.Va.Code*, 49–5–10(a) [1977] [now, 49–5–10(e) [1996]].' Syl. pt. 1, *State v. Bannister*, 162 W.Va. 447, 250 S.E.2d 53 (1978)." Syl. Pt. 1, *In re H.J.D.*, 180 W.Va. 105, 375 S.E.2d 576 (1988).

2. "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995).

3. "The Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession was obtained as a result of the delay in the presentment of a juvenile after being taken into custody before a referee, circuit judge, or a magistrate when the primary purpose of the delay was to obtain a confession from the juvenile. The factual findings upon which the ultimate question of admissibility is predicated will be reviewed under the deferential standard of clearly erroneous." Syl. Pt. 2, *State v. Hosea*, 199 W.Va. 62, 483 S.E.2d 62 (1996).

We begin our discussion by setting forth the text of the circuit court's order, wherein most of the pertinent facts of the instant case are set forth. We then discuss the contentions of the appellant as to why the circuit court's order was erroneous and should be reversed.

The order in question states as follows:

*AMENDED ORDER ON STATE OF WEST VIRGINIA'S MOTION TO TRANSFER AND ORDER ON DEFENDANT'S MOTION FOR RECONSIDERATION OF TRANSFER*

On the 24th day of September, 1997, came the State of West Virginia by J. Christopher Krivonyak and K. Michele Drummond, Assistant Prosecuting Attorneys for Kanawha County; and came the juvenile respondent, in person and by his counsel, Theresa R. Chisolm, Assistant Public Defender, on the State's motion to transfer the above-styled action to the criminal jurisdiction of the Court.

Whereupon, a hearing on the motion was held in camera. The State presented evidence through the testimony of Detective Richard L. Westfall of the Charleston Police Department regarding a statement taken from the respondent. The juvenile respondent presented evidence through the testimony of the juvenile respondent,

1. As is our customary practice with sensitive matters, we use the initials of the last names of juveniles. *See Benjamin R. v. Orkin Exterminating Company, Inc.*, 182 W.Va. 615 n. 1, 390 S.E.2d 814 n. 1 (1990).

**4**

JAMES L.[P.], and his mother, Annette White, concerning parental notification.

In consideration of the evidence presented and the oral arguments of counsel, and the entire record in this case, the Court hereby makes the following findings:

1. James L.[P.], whose date of birth is February 15, 1980, was sixteen (16) years of age at the time of the alleged acts as set forth in the petition.

2. On February 11, 1997, at approximately 6:30 p.m., during an illegal drug transaction the respondent shot and killed Ronnie New with a firearm on Hunt Avenue in Charleston, Kanawha County, West Virginia. The respondent fled the scene and remained at large until he gave a statement to detectives on April 17, 1997.[2]

3. The victim suffered a gunshot wound to the neck and upper shoulder area.

4. Detectives with the Charleston Police Department developed the respondent as a suspect.

5. On April 17, 1997, Detectives Westfall and Shannon went to Capitol High School to speak with the respondent.

6. At the school, Detective Westfall asked the respondent to accompany them to the police department to talk to them about an incident.

7. The respondent agreed. The respondent was not handcuffed or secured in any manner. The respondent was not placed under arrest or taken into custody.

8. Detective Westfall testified that he did not have probable cause to arrest the respondent.

9. Between 10:00 o'clock a.m. and 10:10 o'clock a.m., the detectives and the respondent left the school and drove to the Charleston Police Department and entered a room on the second floor.

10. The respondent was advised of his rights. The detectives used a form entitled "Charleston Police Department Juvenile Interview & Miranda[3] Rights Form." This process began at 10:25 o'clock a.m. and ended at 10:30 o'clock a.m.

11. On the date the form was executed, the respondent was seventeen (17) years of age and had completed eleven (11) years of school. The respondent appeared to be an intelligent person able to read, write, and speak the English language. Further, the respondent related to the Court that he was an A and B student.

12. The respondent initialed and signed the form acknowledging that he understood the following information. "You are being questioned in regard to murder however, you are *not* under arrest and are free to leave at any time. Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him/her with you during questioning. If you are under arrest and cannot afford a lawyer, the court will appoint one for you before any questioning at your request. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. If you are arrested, you have the right to a detention hearing. I have had this statement of my rights read to me and I understand them. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me in connection

2. We take this statement in the circuit court's order, despite its being set forth in the form of a factual finding by the circuit court, as a statement of what the State's contentions were with respect to the appellant.

3. In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that a confession by a person in police custody who had not been warned that he or she had a right to be silent would generally be inadmissible in court—because the confession had been obtained in violation of the person's constitutional right not to be compelled to incriminate him- or herself. This right—and other, related rights of people in police custody, such as the right to have the assistance of an attorney—are generally known as *Miranda* rights; and the warnings given by police that tell people of these rights are known as *Miranda* warnings.

with this interview. I agree to be interviewed, answer questions, and make a statement."

13. After initially denying involvement in the homicide, the respondent subsequently admitted to shooting the victim with a firearm. The statement began at 11:54 o'clock a.m. and concluded at 12:08 o'clock p.m.

14. The respondent was placed under arrest and in custody after the statement had concluded.

15. Detective Westfall testified he contacted the respondent's mother's place of employment after the statement had concluded. Further, Detective Westfall testified that the respondent's mother was allowed to see the respondent upon her arrival at the station house and was allowed to review his transcribed statement.

16. The respondent testified that he had made several requests of Detective Westfall to notify his mother prior to his recorded statement.

17. The respondent's mother, Annette White, testified that she had received a message at approximately 10:45 o'clock a.m. at her place of employment that her son, JAMES L.[P.], was at the Charleston Police Department. She further testified that she arrived at the station house no later than 11:15 o'clock a.m. and was not allowed to see the respondent until his statement was concluded.

18. After having the statement transcribed, an opportunity for the respondent and his mother to review the transcribed statement, processing of the respondent, and after securing an attorney from the Kanawha County Public Defender's Office to represent the respondent, a detention hearing was held at approximately 3:00 o'clock p.m.

Wherefore, based upon the evidence presented and the arguments of counsel, the Court makes the following conclusions of law:

1. Based on the respondent's age, emotional maturity, intelligence, and education, the respondent knowingly, intelligently, and voluntarily waived his constitutional and statutory rights and agreed to be interviewed by the detectives.

2. The respondent was advised of the nature of the accusations against him prior to his statement to the police.

3. The respondent was properly and fully informed of his Miranda Rights by Detective Westfall.

4. The respondent voluntarily, freely, knowingly, and intelligently made an affirmative waiver of his Miranda Rights prior to his statement to the police.

5. In considering the absence of the respondent's mother at the time of the questioning of the respondent by the police as a factor in the totality of the circumstances, the respondent nevertheless knowingly and voluntarily made an affirmative waiver of his Miranda Rights.

6. Any delay in presenting the respondent to a referee, judge, or magistrate was not unreasonable and did not violate the prompt presentation requirement of § 49–5–8(d).

7. There is probable cause to believe that James L.[P.] committed an offense which, if committed by an adult, would constitute the crime of first degree murder.

8. Having found probable cause to believe that a first degree murder was committed and that James L.[P.] committed it, the Court has a mandatory duty under *W.Va.Code*, § 49–5–10(d)(1) to transfer this proceeding to the criminal jurisdiction of the Circuit Court.

In consideration of all of the foregoing, the Court concludes that the State of West Virginia has presented evidence sufficient to warrant a prudent person in the belief that the respondent has committed one of the offenses which shall be transferred to the criminal jurisdiction of the Circuit Court.

It is therefore ORDERED that the above-styled petition be transferred to the criminal jurisdiction of the Court and that prosecution proceed thereon in the manner provided by law. The Court hereby notes and preserves the objection of the juvenile

respondent to all of the findings and rulings contained herein.

On the 26th day of March, 1998, came the defendant, **JAMES L.[P.]**, in person and by counsel, Theresa R. Chisolm, and also came the State of West Virginia by Samuel L. Marsh and William P. Jones, Assistant Prosecuting Attorneys in and for Kanawha County, West Virginia on the *Defendant's Motion for Reconsideration of Transfer* .

WHEREUPON, based upon the defendant's written motion, oral arguments made by both parties, and the record in its entirety, the Court hereby makes the following findings:

1. The Court does have the authority to reconsider its decision to transfer **JAMES L.[P.]** to the adult criminal jurisdiction after indictment based upon newly discovered evidence as enunciated in *State vs. Harmon [Harman]*, 329 S.E.2d 98, 174 W.Va. 731 (1985).

2. The defendant has not presented any newly discovered evidence.

3. With respect to the notification and absence of the defendant's mother, this Court considered it as a factor in light of the totality of the circumstances and previously found that the defendant nevertheless made a voluntarily and knowingly affirmative waiver of his Miranda Rights.

Accordingly, it is therefore **ORDERED** that the *Defendant's Motion to Reconsider Transfer of the Defendant* to criminal jurisdiction of the Court is hereby DENIED.

The Court notes the Objection and Exception of the Defendant to this ruling.

Upon entry of this Order, the Clerk shall provide a certified copy hereof to counsel of record.

ENTERED: _____

               Honorable Charles E. King, Jr.

DATED:   5/11/98

In making the determination embodied in the foregoing order, the legal issue faced by the circuit court under the applicable juvenile-to-adult-jurisdiction transfer law, *W.Va. Code*, 49–5–10(d)(1) [1995], was whether there was *probable cause* to believe that James L.P. had committed murder.[4]

If there was such probable cause, then transfer of the appellant to adult jurisdiction was mandatory under the statute, *id.*—although if the appellant should be ultimately convicted of a crime in the court's adult jurisdiction, the circuit court could return the appellant to the court's juvenile jurisdiction for dispositional (sentencing) purposes. *See State v. Robert K. McL.*, 201 W.Va. 317, 496 S.E.2d 887 (1997).

In the instant case, the appellant's argument is essentially that the circuit court did not have a sufficient evidentiary basis to make the legal determination that there was probable cause to believe that the appellant had committed the offense of murder.

The only significant evidence before the circuit court supporting the court's probable cause determination was the fact that the appellant told the police that he had shot Ronnie New. That is, the appellant confessed to the crime, and he signed a transcript of an interview in which he made this confession. This interview transcript is referred to by the police and the court as the appellant's "statement."

The appellant argued to the circuit court that his confession was obtained illegally— and that therefore the confession could not be used as evidence against the appellant in the transfer hearing. The circuit court denied the appellant's request to suppress his confession.

The appellant contended before the circuit court that his confession was obtained illegally for two reasons:

(1) The confession was the product of an illegal *de facto* arrest ["*de facto* " here means that the police had in effect "arrested" the appellant before he confessed, although without explicitly saying "you're under arrest"];

---

4. In pertinent part, *W.Va.Code*, 49–5–10(d)(1) [1995] states:

    (d) The court shall transfer a juvenile proceeding to criminal jurisdiction if there is probable cause to believe that: (1) The juvenile is at least fourteen years of age and has committed the ... the crime of murder....

(2) The confession was taken in violation of the "prompt presentment" (to a judicial officer) and "parental notification" requirements of *W.Va.Code*, 49–5–8(c)(1) and (4) [1998].[5]

We proceed to discuss and evaluate these reasons.

The appellant's first argument is that he was, in effect, "under arrest" when he left the school and went with the police to the police station.

■ If the appellant was indeed under arrest when he left the school, and if that arrest was illegal, then any confession that was obtained as a result of such arrest would be inadmissible against the appellant in court—because, as we said in Syllabus Point 6 of *State v. Giles*, 183 W.Va. 237, 395 S.E.2d 481 (1990):

> "A confession obtained by exploitation of an illegal arrest is inadmissible. The giving of *Miranda* warnings is not enough, by itself, to break the causal connection between an illegal arrest and the confession. In considering whether the confession is a result of the exploitation of an illegal arrest, the court should consider the temporal proximity of the arrest and confession; the presence or absence of intervening circumstances in addition to the *Miranda* warnings; and the purpose or flagrancy of the official misconduct."

Syllabus Point 2, *State v. Stanley*, 168 W.Va. 294, 284 S.E.2d 367 (1981).

The police freely conceded, at the circuit court transfer hearing, that when they left the school with the appellant and drove him to the police station, they did not have probable cause to arrest the appellant. At that time, based on information they had received, the police only had suspicions about the appellant. The police thus agreed that they did not have legal grounds to arrest the appel-

lant until *after* the appellant confessed, at the police station, that he had shot Ronnie New.

The issue before the circuit court, then, was whether the police had "arrested" the appellant before he confessed. The circuit court concluded that the appellant was not "under arrest" before he confessed. This was a legal conclusion by the circuit court, based on the circuit court's factual determinations, or findings, as to what happened leading up to the confession. This Court's task is to rule on the appellant's contention that the circuit court erred in making these findings and this conclusion.

■ To perform this task, we first consult prior cases where we have discussed what constitutes being "under arrest." We have set forth a number of formulations of what constitutes an arrest. One formulation is that:

> "An arrest is the detaining of the person of another by any act or speech that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest." Syllabus point 1, *State v. Muegge*, 178 W.Va. 439, 360 S.E.2d 216 (1987).

Syllabus Point 3, *State v. Giles*, 183 W.Va. 237, 395 S.E.2d 481 (1990).

■ We have also stated that "[t]ransporting a citizen, *involuntarily*, miles to a police station for purposes of interrogation is the functional equivalent of an arrest requiring probable cause." *State v. Todd Andrew H.*, 196 W.Va. 615, 621, 474 S.E.2d 545, 551 (1996) (emphasis added).

■ We have also said that an arrest, or custodial detention equivalent to an arrest, occurs when under objective circumstances, "a reasonable person in the suspect's position would have considered his or her freedom of action curtailed to a degree associated with a

---

**5.** *W.Va.Code*, 49–5–8 [1998] states, in pertinent part (a previous enactment of 49–5–8 was in effect at the time of the appellant's hearing, and had a different subsection numeration for this language):

> (c) Upon taking a juvenile *into custody*, with or without a court order, [an] official shall:
>
> (1) Immediately notify the juvenile's parent, guardian, custodian or, if the parent, guardian

or custodian cannot be located, a close relative; .

\* \* \*

(4) Take the juvenile without unnecessary delay before a juvenile referee or judge of the circuit court for a detention hearing pursuant to section eight-a of this article . . .
(Emphasis added.)

formal arrest." Syllabus Point 3, in part, *State v. Preece*, 181 W.Va. 633, 383 S.E.2d 815 (1989).

In the instant case, the circuit court found as a fact that the appellant, a suspect, had consented to go with the police to the station—or, put another way, that the appellant's going to the police station was entirely voluntary.

If the circuit court had a permissible basis for this finding, that the appellant's going with the police to the police station was consented to and entirely voluntary, then the appellant was not "under arrest" prior to his confession, and the confession was therefore not obtained as the result of an illegal arrest.

At the transfer hearing, the circuit court heard conflicting testimony—from police detective Westfall, from the appellant, and from the appellant's mother—regarding the circumstances that preceded the appellant's confession at the police station.

The appellant testified that when the appellant and Kiva H., another student whom the police also wanted to question about the Ronnie New shooting,[6] were called out of class and came to the principal's office, the police

> set me down and they told me they were charging me with the murder of Ronnie New.... I told him I didn't know what he was talking about and asked him if he could please call my mother at work ... they told me I had to come to the station to get questions asked ... one detective walked out the front door before me and the other walked in front of me ... when we got to the outside of the door ... Detective Westfall grabbed my wrist and I had a pencil in my hair and he took the pencil out of my hair and said, "You don't need this 'cause I don't want to catch one in the neck," so they escorted me on each side ... [at the police station] they told me whether I gave a statement or not that I would be charged with something connect-

ed with the murder so the only way I could help myself was to give a statement ... I thought [the Miranda warning] was something they gave people when you are under arrest that they read you your rights before you are placed under arrest ... [no one told me] "You don't have to answer any of our questions" [or] "You don't have to go to the police station unless you want to" ... They told me I had to go ... I ask[ed Detective Westfall] at the school and I asked him twice on the ride down there and I asked him again when we got to the station ... to contact my mom ... on the ride down I told him my mother's work number and I guess he wasn't paying any attention and we got back to the station and I told him to call again and I gave him the number ... every time they would walk out the room, they would shut ... the door and told me to "Wait here until I get back" ... [leaving the school] Detective Westfall had me by the wrists and the other one walked beside me ... They told me I had to come, so I thought I didn't have any choice but to go ... They told me I had to sign [the Miranda form] ....

The appellant's mother testified that after receiving a phone message at work, she telephoned the police department and was told that the police had her son in custody for murder. She testified that she went to the police station and

> waited and waited and waited and finally ... Westfall came out and told me that [the appellant] was being questioned and they would be with me in a little while ... I was allowed to see him while [his statement] was being typed out ... [I signed his confession as a witness because the appellant] led me to believe that was the only way they were going to let him go.

Detective Wallace testified that at the high school

> I briefly interviewed [the appellant] and asked him if he would come down to the police department to talk to us about an incident.

---

6. In a police statement taken from an informant, Kiva H. was identified as being present at the shooting scene. Kiva H. apparently was taken to the police station at the same time that the appel-

lant was, but the record is unclear on what happened to Kiva H. after arriving at the police station.

Q Did he agree to accompany you down to the police department?

A Yes, he did.

Q Was he placed under arrest?

A No.

Q Handcuffed?

A No.

Q Did you grab him by the arm and direct him to the car?

A No.

Q How did he accompany you?

A He just walked, casually.

\* \* \*

Q Did you advise the juvenile of his constitutional rights when you got down to the police station?

A Yes, I did.

Q Did you use that form to assist you?

A Yes, I did.

\* \* \*

Q Now, in the second section it has Pre–Interview, and it has two spaces; one of them says, "You are being questioned in regard to a murder. However, you are not under arrest and are free to leave at any time."

Did you read this to him?

A Yes, I did.

Q And you advised him that he wasn't under arrest at that time?

A That's correct.

Q Did you tell him that he was free to go?

A Yes.

Q Was he, in fact, free to leave at that time?

A Yes.

Q Did he sign off saying he understood this?

A Yes.

[Cross-examination:]

Q And once you arrived at Capital High School, you made arrangements to have Jim called from his class into an assistant principal's office, isn't that correct.

A No, not exactly.

Q Would you explain what you did after you arrived at Capital High School?

A Him and Kiva [H.] were brought into the principal's office.

Q At your request?

A Yes.

Q And at that time, did you have a warrant with you for Jim's arrest?

A No.

Q Do you have probable cause for his arrest?

A No.

Q Did you ask him about the murders?

A Not at that point.

Q Did you—what—did you tell him that he was under arrest for murder?

A No.

Q What is it you say that you did then, Detective Westfall?

A That there was a matter that was under investigation that we needed to discuss with him.

Q Did you mention that it was a murder that you needed to discuss with him?

A I don't think so. I usually don't say a lot before. I asked him if he would come down and talk to us and he agreed.

Q And was Kiva [H.] present and was Mr. White present in the room when you had whatever discussion you had with him about your need to talk with him?

A No, I think the only one that was there was Detective Shannon and myself.

Q Okay. So when you said you needed to discuss something with him at the station did he inquire, "What do you want to talk with me about?"

A No.

Q Okay. Did he ask to contact his mother?

A No.

Q Did you tell him at that time—you've testified that you told him at the station that he was not under arrest.

Did you tell him at the school that he was not under arrest?

A Yes.

Q But you didn't tell him that he was free to not answer any questions, did you?

A   I didn't ask him any questions.

Q   Did you tell him, Detective Westfall, not to answer any questions when—

A   At what point?

Q   When you asked him to go to the police station with you to answer some questions, did—

A   No.

Q   —did you tell him that he didn't have to go to answer any?

A   I just asked him if he would accompany us to the police station.

Q   So you didn't tell him he didn't have to go—accompany you to the police station?

A   No.

Q   You didn't tell him that if he wanted to, he was free to go on back to his class if he wanted to, did you?

A   No.

\*      \*      \*

Q   —so you pretty much are testifying that you read him his Miranda warnings pretty much as soon as he arrived at the—

A   Absolutely.

Q   Okay. Did you tell him then he was free to go?

A   Yes.

Q   Did you tell him he didn't have to answer any questions?

A   Yes.

Q   Did you tell him—so here you're telling him things that you didn't tell him back at the school?

A   On the Miranda Rights Form.

Q   I'm asking you—well, I don't see anywhere on the Miranda Rights form where you told—

A   "You have the right to remain silent."

Q   I don't see anywhere on the Miranda Rights form where is says you are free to go.  Did you tell him that?

A   Yes. It says, "You are being questioned in regard to murder, however, you are not under arrest and are free to leave at any time."

\*      \*      \*

Q   And you were asking him questions at some point about a murder, correct?

A   Correct.

Q   And I presume when you first started asking him questions about the murder, that would be what you would call the pre-interview, is that correct?

A   Yes.

Q   Was the pre-interview recorded or taped in any manner?

A   No.

Q   Isn't it true that at the initiation of your conversation with Mr. [P.], he denied any involvement with any murder on Hunt Avenue or anywhere?

A   That's correct.

Q   Okay. So why, then, didn't the questioning end at that time?  Did you tell him then he was free—he said, "I don't know nuttin (sic) about it."  Did you say, "You're free to go?"

A   No.

Q   Okay. So you say he denied any involvement, Detective Westfall, up and until what point?

A   Until I started telling him things that we had and information that we had, and he started telling the truth.  He kind of broke down. The guy is intelligent. He's not stupid.

Q   Isn't it true, Detective Westfall, that at some point Jim was told, "It looks like you're going to be charged with murder regardless?"

A   I don't recall that.  I didn't say that.

Q   Did you make—do you recall anybody else saying that?

A   Not in my presence.

Q   Okay. Did anyone in your presence say, "The only way we can help you is if you give a statement and then we can only help you with the bond?"

A   No.

Q   Did Duke Jordan come into that interview room to meet with Jim at any time?

A   He may have.

Q   Was he one of the detectives on this murder investigation?

A No, I think he was familiar with James.

Q Okay. But you were not familiar with James before this point?

A No.

Q And did you make—well, let's see, the statement was completed at 12:—what, 12:08? It started at 11:54 and completed at 12:08, is that correct?

A That's correct.

Q Did you make any effort during that time to get this child before a juvenile referee, a magistrate or a circuit court judge?

A No.

Q Did you make any effort to contact his mother?

A After the statement was transcribed, and as you can see on the top of the rights form, James gave me a phone number and his mother's name.

Q Okay.

A Then we started attempting to get a hold of her.

Q So then you immediately attempted to reach his mother after the rights form was signed which was somewhere around 10:30?

A No, it was later than that.

Q It was after the statement was taken, correct?

A Right, sometime in that period.

Q If he asked at the time that his Miranda Warning was given that his mother be contacted, why then was she not contacted until after this statement was taken?

A I don't recall him asking that.

Q Well, why is it that you think her telephone number is on the front of the rights form?

A Because that's what I had to write on at the time.

Q Why did you write his mother's number down?

A So I could call her.

Q So you could call her at your own initiative but not at his request? In other words, you wanted her—

A No. As soon as he gave me the number I went and tried to call.

Q Okay, which was somewhere shortly after—well,

A I'm not sure of the exact time but it was after the statement was transcribed— before it was transcribed.

Q Well, could I refresh your memory— well let me go back—

MS. CHISOLM: Your Honor, I don't want to take up a lot of time on this, we could maybe get back to Detective Westfall on this issue.

THE COURT: If it relates to the receipt of the statement or the issue, now is the time to do it, because I'm not going to permit further—

MS. CHISOLM: Okay, Your Honor.

THE COURT: —examination with respect to this issue after—

MS. CHISOLM: I understand.

[Redirect examination:]

BY MR. KRIVONYAK:

Q Did his parents ever show up?

A Yes.

Q And were they there when—or did the respondent read over the statement after it had been transcribed?

A Yes, he did.

Q Did he sign off that it was accurate?

A He—

Q Did he sign off on each page?

A Yes. I had him sign each page indicating that he had read each page individually and then I had him on the last page to sign on the bottom where it says, "I have read this statement."

Q And were his parents present at the time he read over that, were they available to read over that with him?

A Yes, they were present, and they also signed as witnesses on the statement.

Q At the time he was checking the statement and reading it over, did he have an opportunity to make any corrections?

A Yes, but he didn't find anything that he felt needed corrected.

Q And he signed off, then?

A Yes.

MR. KRIVONYAK: Okay, that's all we have.

THE COURT: Is there recross, Ms. Chisolm?

MS. CHISOLM: Yes, Your Honor.

The written transcript that the appellant signed, with his mother signing as a witness, stated as follows:

Statement of JAMES LONNY [P.]

DETECTIVE WESTFALL:

Q. JAMES, have you been advised of your Miranda Rights?

A. Yeah.

Q. Do you understand each of these rights as they were explained to you?

A. Yeah.

Q. Did you also sign a waiver of these rights?

A. Yeah.

Q. JAMES, we're investigation a shooting that occurred on Hunt Avenue back in February, do you have any information regarding this shooting?

A. Yes.

Q. Could you in your own words, in as much detail as possible tell us what you know regarding this matter?

A. On that day I was standing by myself for a second. A guy pulled up to me shaking his head, wanted to buy dope, or crack. I didn't have none. So before the guy pulls off the guy that was standing with me told me to stop the guy before he pulled off. I stopped him and he pulled over a little ways. The guy went to the window, the guy said he wanted, I don't know how much, he said he wanted some dope. As the guy pulls it out and puts the dope in his hand the door flies open and the guy says come here mother fucker and I was taking a couple steps back to where the gun was laying at. I picked it up and I shot him and ran.

Q. Can you describe the car that this ...?

A. It was a brown, it was an older model. The guy had on a white shirt, I forget what kind of pants.

Q. Can you describe the guy that was shot?

A. He was white, kind of big, had a little facial hair. When I ran, I ran and hopped in my friends truck and told him what happened. That was it, we went back to his house.

Q. What was your friend's name?

A. I don't know his real name, but he goes by LOC, he's an older guy, like 22.

Q. Whose car did you get into?

A. JONATHAN [B.]. The same night I told them I was gonna come down here and tell but I was so scared because of my mom.

Q. What kind of vehicle does JONATHAN have?

A. A Ford Bronco.

Q. Do you know what year it is?

A. '88 or '89.

Q. Who else was standing out there when this incident occurred that you know by name?

A. Just me and JONATHAN. KIVA [H.] was out but he wasn't there, he was doing something else.

Q. Did KIVA know what was happening?

A. No. He probably knew when he walked around the corner but he didn't find out from me.

Q. What did you do with the gun?

A. I threw it in the bushes in the alleyway, the same alleyway it was in before I got it.

Q. What kind of gun was it?

A. A .22, it was chrome.

Q. Would you describe the subject that was trying to sell the drugs to the guy in the car?

A. Black guy, has a fade, side burns, had a little hair under his chin.

Q. Do you recall what you were wearing that night?

A. Blue jeans, black boots and I had on a brownish t-shirt and I had on a black windbreaker type coat.

SHANNON:

Q. How did you come in possession of the weapon?

A. The gun just be back there. Everybody knows where the gun is. It's there for whoever needs it. I knew it was there.

Q. Do you know who put the gun there?

A. No sir.

WESTFALL:

Q. Do you know about what time of day it was when this happened?

A. Probably about 6:30 or 7:00. The sun was going down.

Q. Is there anything we haven't asked you that you thing should be added to this statement?

A. No sir. I told him some guy jumped out and I just shot him. People was telling me to turn myself in but I didn't know what to do for the fact of my mother.

Q. How many times did you shoot?

A. Just once. Shot once and ran.

Based on the evidence at the transfer hearing, and particularly on the testimony and statement set forth hereinabove, the circuit court concluded in its transfer order that the appellant had voluntarily agreed and consented to a request by the police that he accompany them to the police station to talk about an incident, and that the appellant was not under arrest when he confessed.

The appellant's brief characterizes the appellant's action in going with the police as not voluntarily "agreeing" to go with them, but as "acquiescing" to their demands. The appellant also points out that under a Kanawha County School Board policy (apparently this point was not brought up by the appellant at the transfer hearing), a principal is instructed not to release his *"in loco parentis"* custody of a pupil to the police, without the presentation of a warrant by the police, and without notifying the pupil's parent or guardian.

We have independently reviewed all of the testimony and evidence that was before the circuit court. We conclude that the evidence supporting the appellant's version of events—a version that the appellant contended showed that he was illegally placed under arrest at his school—was weak, lacked credibility and persuasive force, and was countered with credible evidence of an alternative version of events, as testified to by the police.

The appellant testified that at the school, the police directly confronted the appellant about the Ronnie New murder. Detective Westfall testified that the appellant was only asked if he would come to the police station to talk about an unspecified "incident," and not told about a specific crime or murder.

The appellant testified that the police told him that he had no choice about leaving the school—that he had to come to the station with them. Detective Westfall testified that he simply asked the appellant, and he agreed, to go to the police station.

The appellant testified that he was gripped by the police as they left the school. Detective Westfall denied any holding or gripping of the appellant.

The appellant testified that he repeatedly requested that his mother be contacted—beginning when he was at his school—and that the police repeatedly ignored these specific requests. Detective Westfall's testimony on this point was that the appellant requested that his mother be called for the first time at the police station, after he had confessed—and that the police complied with that request.

The appellant further testified that he was in essence confined at the police station, and never advised that he could leave at any time. The police testimony was to the contrary—that the appellant was told at the police station that he was not under arrest and was free to leave. The appellant's signed confession indicates that he acknowledged being so told.

The appellant testified that the *Miranda* warnings at the police station—that he could remain silent, etc.—had no effective meaning to the appellant. The police testimony was that the appellant understood and acknowledged these warnings—and was corroborated by the signed statement.

The appellant did not call the school principal as a witness, to support the appellant's argument that he was in effect "handed over" to the police, and to explain why the principal did not ask the police for a warrant. The appellant also did not call Kiva H. as a witness, to explain from Kiva H.'s perspec-

14

tive what had happened at the principal's office. In his testimony, the appellant did not suggest that the authority or conduct of the principal had anything to do with the appellant's going to the police station.

As previously noted, as an appellate court, we generally give deference to factual determinations by trial courts.[7] In the instant case, the circuit judge had the job of deciding whether to believe the appellant's version of the factual events and circumstances that led up to the appellant's confession, or the version of events testified to by the police. After ·carefully reviewing all of the testimony and evidence presented at the transfer hearing, we think that the circuit judge was entitled to conclude that the appellant was not telling the truth about important facts and circumstances that led up to the appellant's confession.

To our reading, when looked at in the context of all of the testimony before the circuit court, the appellant's testimony at the transfer hearing—of being confronted directly about the murder at the school, of receiving an unequivocal demand that he come to the police station, of being gripped by the police officers, of making repeated requests for his mother that were ignored, and of essentially of being detained against his will until he confessed—can reasonably be seen as being embellishments or fabrications, made to bolster the argument that the appellant had in fact been arrested at the school.

We conclude that, in the context of deciding the juvenile-to-adult-jurisdiction transfer issue, the Circuit Court of Kanawha County had a sufficient evidentiary basis to question the accuracy of the appellant's factual rendition of the events that led up to his confession—particularly regarding key facts that were determinative of the legal question of whether the police had in effect "arrested" the appellant at the school.

· If the circuit court judge could permissibly conclude that the appellant was not telling the truth about what had led up to his confession, then the judge could also permissibly believe that the probable truth lay in the competing or alternative version of events that was testified to by the police.

Crediting the version of facts that was testified to by the police, the circuit court could permissibly conclude from those facts, as a matter of law, for purposes of the transfer hearing, that the appellant was not, prior to confessing to shooting Ronnie New, detained by actions or speech of the police indicating an intention to take the appellant into custody and subjecting the appellant to the actual control and will of the police (cf. Syllabus Point 3, State v. Giles, 183 W.Va. 237, 395 S.E.2d 481 (1990)).

Therefore, the circuit court could permissibly conclude that the appellant's confession should not be suppressed as the product of an illegal arrest.

The appellant also argues that his confession/statement should have been suppressed at the transfer hearing because the confession was obtained in violation of the "parental notification" and "prompt presentment" requirements of W.Va.Code, 49–5–8 [1998].[8]

Both of these statutory requirements are dependent on a juvenile being "in custody." This Court has stated that, in the context of juveniles who are suspected of having committed criminal offenses, the "custody" status triggering the application of these statutory requirements is ordinarily the same as and the equivalent of "arrest" status. State v. Ellsworth J.R., 175 W.Va. 64, 70–71, 331 S.E.2d 503, 509 (1985). See also State v. George Anthony W., 200 W.Va. 86, 92, 488 S.E.2d 361, 367 (1996); In the Matter of Steven William T., 201 W.Va. 654, 661, 499 S.E.2d 876, 883 (1997).

We have already held that the circuit court permissibly concluded that the appellant was not "under arrest" prior to his confession—because he was with the police entirely vol-

---

7. However, when constitutional rights, like the right against compelled self-incrimination that is implicated in the instant case, are involved, we give de novo scrutiny to ostensibly "factual" determinations that entail the application of law or constitute legal judgments that transcend ordi-

nary factual determinations. See Appalachian Power v. Tax Dept., 195 W.Va. 573, 582, n. 5, 466 S.E.2d 424, 433 n. 5 (1995).

8. See note 4 supra.

untarily. We similarly determine that the circuit court also permissibly concluded, for purposes of the transfer hearing, that the appellant was not "in custody," for purposes of the application of *W.Va.Code*, 49–5–8 [1998].

In summary, we find that the circuit court permissibly concluded that, for purposes of the transfer hearing, the appellant's confession did not have to be suppressed as the fruit of an illegal arrest or in violation of statutory duties arising out of the official custody of the appellant. The circuit court therefore did not err in admitting the appellant's confession/statement in the transfer hearing, to establish probable cause that the appellant had committed the offense of murder.[9]

Finding no reversible error, we affirm the order of the circuit court transferring the appellant to the adult criminal jurisdiction of the court.

Affirmed.

Chief Justice STARCHER filed a dissenting opinion in which Justice McGRAW joined.

STARCHER, Chief Justice, dissenting:

For purposes of deciding the instant case, I am willing to agree with the majority's basic proposition—that the circuit court could permissibly conclude (from the evidence at the transfer hearing) that the appellant was probably embellishing and fabricating, to bolster his case that he was in effect "under arrest" when he left his school with the police.

The majority then, upon finding that the circuit court could credit the police version of events, holds that—under those facts—the circuit court could conclude that the appellant was not "under arrest" or "in custody."

This is where I part company from the majority. Assuming that the police version of events was accurate, I would still say that the appellant was both "in custody" and in

effect "under arrest," when he left school with the police.

Here is a likely scenario that is entirely consistent with the police testimony. In the principal's office, the police said to the appellant, "We want to ask you some questions about an incident we are investigating. We'd like you to come down to the police station and talk to us about it. OK?"

The appellant replied, "OK." He then accompanied the police to the station, freely, with no gripping by the arms, no requests for his mother, etc.

The question we must ask is: would a reasonable 17–year–old, under these circumstances, have felt free to say "no" to the police request?

According to the police version of events, the appellant was affirmatively told that he was "free to go"—but he was told this *only when he got to the police station.* Where was he supposed to go then—out the station house door for a several-mile hike back to school?

In order to support their conclusion that the appellant was in effect not under arrest or in custody when he left the school with the police, the majority has to believe that a reasonable high-school senior in the appellant's shoes would have felt feel free to say "no" at the principal's office to the police request that he accompany them. *See* Syllabus Point 3, in part, *State v.. Preece,* 181 W.Va. 633, 383 S.E.2d 815 (1989).

But I don't see any evidence to support such an improbable belief. Common sense tells me that like any other reasonable high-school senior in the same situation, the appellant went with the police because, based on the objective circumstances, he felt that he *had* to do as they asked. *Certainly no one had told him differently.* Juveniles aren't just "free" to leave school in the middle of the day whenever they want, with anyone who shows up. They have to be in someone's

---

9.  Our ruling is only with regard to the admissibility of the appellant's confession in the juvenile-to-adult-jurisdiction transfer hearing, and we express no opinion as to the confession's admissibility in any other proceeding. The appellant also claims on appeal that his confession should have been suppressed because it was not given voluntarily. Based on the foregoing reasoning, for purposes of the transfer hearing, we find this claim to be without merit.

custody, or the school isn't supposed to let them go.

Thus, because the evidence at the transfer hearing, viewed in the light most favorable to the prosecution, tended to show that the appellant's confession was the product of either an illegal *de facto* arrest without probable cause, or alternatively was obtained after the appellant was in police custody without being promptly presented to a magistrate or having a chance to consult with his parents or guardian, under our established law, the circuit court should have ruled that the confession was, on the evidence presented, inadmissible.

I would vacate the transfer order, because it was based on the appellant's confession, and remand the case for further proceedings. But I would also allow the prosecution and the defense on remand to put on further evidence—say from the principal, and from Kiva H.—to try to more accurately establish what actually happened before the appellant left school with the police. The circuit court should know, for example, how and why the principal appears to have violated a specific policy requiring that the police present a warrant before removing a student from school.

Of course, these and other factual issues regarding the circumstances leading up to the appellant's confession may still be addressed at the appellant's criminal trial in the circuit court's adult jurisdiction, if there is one.[1]

I am authorized to state that Justice McGRAW joins me in this dissent.

---

1. The instant case, like many "confession suppression" cases, reflects a tension that often exists in criminal investigations. The police, for good reasons, strongly want to do their job of solving crimes and bringing the perpetrators to justice.

But our Bill of Rights and our statutory law, for equally good reasons, draw a number of lines around police conduct—lines that sometimes make it harder to get evidence about a crime. These lines include the protections that we afford to juveniles, particularly those who are in police custody.