639 S.E.2d 809

**STATE of West Virginia, Plaintiff
Below, Appellee**

v.

**Ronnie Allen RUSH, Defendant
Below, Appellant.**

No. 33035.

Supreme Court of Appeals of
West Virginia.

Submitted: Oct. 3, 2006.

Decided: Nov. 30, 2006.

Dissenting Opinion of Justice
Maynard Dec. 4, 2006.

Concurring Opinion of Justice
Benjamin Jan. 2, 2007.

Teresa C. Monk, Rocky D. Holmes, Deena Boyles, Public Defender Corporation, Spencer, for the Appellant.

Darrell V. McGraw, Jr., Attorney General, Robert D. Goldberg, Assistant Attorney General, Charleston, for the Appellee.

PER CURIAM.

This case involves the appeal of Ronnie Allen Rush (hereinafter referred to as "Appellant") of his conviction as an adult by a jury in the Circuit Court of Calhoun County of two counts of manslaughter, one count of first-degree robbery, one count of burglary and one count of conspiracy to commit burglary. Appellant claims that reversal is warranted on several grounds: failure to suppress statements obtained through prompt presentment violation and coercion; inappropriate transfer of the case from juvenile to criminal jurisdiction of the circuit court; refusal to set aside the verdict for first-degree robbery due to insufficient evidence; not returning the case to juvenile status when the jury failed to find Appellant guilty of the charges which elevated his case to adult status; and refusal to sentence Appellant as a juvenile. Having before us the petition for appeal, briefs of the parties and designated record of the proceedings and decisions below, this Court affirms the transfer of the case to the court's criminal jurisdiction but reverses the conviction on prompt presentment grounds.

## I. Factual and Procedural Background

In the late night or early morning hours of May 14 and 15, 2003, sixty-nine year-old Warden Groves and his companion, sixty-year-old Mary Hicks, were murdered while asleep in separate bedrooms in Mr. Groves' house at Sand Ridge, Calhoun County, West Virginia. Both were shot at close range with a shotgun. Appellant, who was sixteen years old at the time,[1] was present when the shooting occurred as he was an overnight guest at

Mr. Groves' home. After the shooting, Appellant drove one of Mr. Groves' vehicles to his father's home less than a mile[2] away to telephone 911.[3] Appellant informed the 911 operator that two elderly persons had been shot and, although he was actually making the call to 911 from his father's trailer, he had been sleeping in an upstairs bedroom of the house where and when the shootings occurred.

As related in the record, law enforcement officers from the county sheriff's office and the State Police responded to the murder scene and discovered the bodies. A deputy sheriff was sent to the home of Appellant to request that he accompany the deputy to the crime scene. Appellant obliged the officer and they arrived at the crime scene around 2:00 a.m.; Appellant was left in the sheriff's car upon arrival. At some point before 3:30 a.m., the deputy sheriff returned to the vehicle to perform a gun residue test on Appellant at the request of Trooper Douglas Starcher of the State Police, which test later proved negative. Around 3:30 a.m., Trooper Starcher had Appellant move to his vehicle where he informed Appellant that he was not under arrest and free to leave before apprising Appellant of his *Miranda* rights. Following Appellant's waiver of rights, the trooper set up a tape recorder on the hood of his cruiser and proceeded to conduct and record[4] Appellant's interview outside of the vehicle. The interview lasted about forty minutes.[5] Afterward, Appellant waited in the State Police car while Trooper Starcher and the deputy sheriff returned to reinvestigate the crime scene in light of the explanations Appellant had provided during the interview. Trooper Starcher testified that there were troubling inconsistencies between

1. Appellant's date of birth is October 23, 1986.

2. According to the record, Appellant's home was approximately three-tenths of a mile from Mr. Groves' house.

3. The 911 service had a record of two phone calls about the incident from Appellant between 12:30 a.m. and 1:30 a.m. on May 15, 2003.

4. The tape and its transcription were entered into evidence at the transfer hearing and the criminal trial.

5. Trooper Starcher testified that during the taped interview he observed Appellant had a vertical red mark on his right interior shoulder, which is consistent with a mark left from a shotgun recoil, in addition to marks on his face that could be possible signs of being present when a shotgun is fired. Another trooper testified Trooper Starcher told him about these marks and that when he intentionally looked at these areas of Appellant's body at about 4:30 p.m. during his pre-polygraph interview he observed no marks in these locations.

the crime scene and facts related in Appellant's statement.

When Trooper Starcher returned to his car he drove Appellant to the Grantsville, West Virginia, State Police Detachment.[6] At around 6:00 a.m., another trooper, First Sergeant Dale Fluharty,[7] began questioning Appellant at the detachment after again informing Appellant of his *Miranda* rights. Appellant testified that Trooper Fluharty told him that he could leave at this time, but when Appellant started to leave Trooper Fluharty "asked me if I was getting smart with him and he would rip my F-ing head off" after which the trooper said that Appellant was not permitted to leave the detachment.[8] Although Trooper Fluharty's interview[9] lasted approximately two hours, no statement was taken allegedly because Appellant had agreed to take a polygraph test.[10] After Appellant consented to take the test he was moved to another office to await the arrival of the polygraph tester from the Fairmont area.

According to testimony, the State Police polygraph tester, Sergeant Karl Streyle, arrived at the detachment at 2:30 p.m. that day and met alone with Appellant. Trooper Streyle began the pre-test interview with Appellant which included providing *Miranda* warnings and completing a waiver of rights statement. During the course of the interview, Appellant said that he would probably fail the test if Trooper Streyle asked if he could truthfully respond to the question of who killed the victims. Appellant also asked Trooper Streyle if he could go home that evening because he was a juvenile and he had a paper stating that he was mentally retarded.[11] As reflected in the record, after knocking on the door where Trooper Streyle was interviewing Appellant, Trooper Fluharty entered the room very upset and told Appellant in a raised voice that new evidence had been found and warned Appellant to tell what he knew about what went on at the Groves house.[12] According to Trooper Streyle, immediately thereafter Appellant's demeanor changed and he appeared frightened and asked the trooper if he would ask Trooper Fluharty to return to the room to find out what the evidence was. Trooper Streyle left the room, asked Trooper Fluharty to calmly return to the interview room. Trooper Fluharty returned to the room and told Appellant that he was not sure about what evidence existed but that he should keep talking to Trooper Streyle. When Trooper Fluharty then left the room for a second time, Trooper Streyle related that Appellant became very upset, stood up from his chair and indicated that he wanted an attorney before he talked with anyone else. After Appellant invoked his right to counsel and right to remain silent, Trooper Streyle stopped the pre-test interview; the official ending of the pre-test interview is reflected in the record as 5:00

6. We take judicial notice that Grantsville, West Virginia, is located 13.3 miles from Sand Ridge, West Virginia. 2006 Google—Map data ©2006 NAVTEQ ™.

7. The record reflects that Trooper Fluharty had been at the crime scene around 4:00 a.m. and had asked Trooper Starcher to transport Appellant to the Grantsville detachment. Trooper Fluharty drove separately to the detachment where he arrived around 5:50 a.m.

8. Trooper Fluharty said that he did not threaten Appellant. The State Police polygraph tester who had been told about the threat by Appellant testified that he questioned Trooper Fluharty about his using profanity and otherwise intimidating Appellant and Trooper Fluharty shrugged and told the tester that he had no patience for interviewing any more.

9. Trooper Fluharty testified that Trooper Starcher was intermittently present during this interview.

10. Appellant informed the trooper who was to administer the lie detector test about the threatening and profane statements Trooper Fluharty had made.

11. The record contains two reports from court ordered evaluations which indicate that Appellant scored a 64 and a 69 on previous IQ tests, putting him at a low-moderate to mild mental retardation level. The reports also relate that Appellant had completed the ninth grade before quitting school but is functionally illiterate, with reading, writing and math skills at no more than the first grade level.

12. The following is an excerpt from the testimony of Trooper Fluharty at the transfer hearing regarding what spurred him to become upset and interrupt the pre-polygraph interview: "Sergeant Cooper called and informed me that he had found some money in some vehicles that implicated Ronnie Rush and that, based on what he had found, Ronnie was definitely involved in this crime."

p.m. According to Trooper Streyle's testimony,[13] he informed Trooper Fluharty and Trooper Starcher of Appellant's assertion of the rights to counsel and silence.[14] Trooper Streyle testified that he left the detachment about an hour after the interview ended and no trooper had approached or talked with Appellant during that time. Trooper Fluharty testified that at some point after the pre-test interview concluded he told Appellant that he was free to leave and he would take Appellant home, or he could wait at the detachment until the detachment commander, Sergeant Jeff Cooper, returned from speaking with the prosecutor. At the same time Trooper Fluharty informed Appellant that if he decided to leave and the prosecutor did advise that charges be filed then troopers would pick him up at his father's trailer later that evening. Appellant remained at the detachment.

It was established that Trooper Cooper arrived at the crime scene between 9:30 and 10:00 a.m. on May 15, 2003. After conducting a walk-through of the Groves house and speaking with officers at the scene, Trooper Cooper proceeded to the trailer of Appellant's father. Trooper Cooper collected guns and money at both residences and in vehicles parked at both locations.[15] Given the inconsistencies in Appellant's statements and the

evidence he collected, Trooper Cooper testified that he believed he had sufficient cause to take Appellant into custody. Based on that conclusion, Trooper Cooper proceeded to try to locate the prosecutor, who was not in his office or reachable by cell phone, in order to obtain his opinion.[16] Trooper Cooper arrived at the detachment at about 7:45 p.m.,[17] and he told Appellant that based on the evidence he uncovered and a discussion with the prosecutor Appellant was under arrest for both murders and possibly robbery. Appellant became emotional after hearing about the charges and expressed his sorrow and love for the deceased victims. Trooper Cooper testified that while he knew through a phone conversation with Trooper Fluharty before he returned to the detachment that Appellant did not take the polygraph, he was not informed Appellant had asserted his right to silence and had asked for an attorney.[18] He went on to say that because he felt that Appellant's statement could be construed as some type of confession, he advised Appellant of his constitutional rights by reading the rights form statements to Appellant, and had Appellant initial each statement before signing the form to indicate that he agreed to waive his rights. After obtaining the rights waiver at 7:52 p.m., Trooper Cooper proceeded to conduct another tape recorded interview of Appellant, which concluded at 10:02 p.m.[19] During the interview,

**13.** Trooper Streyle not only testified but he also was the author of memoranda admitted into evidence about what had occurred before, during and after the pre-test interview, including receiving a request from a fellow officer to omit from the routine report any mention of the fact that Appellant had asserted his right to counsel. An internal State Police investigation was conducted regarding these events.

**14.** Trooper Starcher testified at the transfer hearing that Trooper Streyle did not inform him and Trooper Fluharty that Appellant had requested a lawyer; Trooper Fluharty testified at the transfer hearing that Trooper Streyle told him that Appellant wanted a lawyer.

**15.** Review of any determinations about the admissibility of this evidence is not before us in this appeal.

**16.** The State maintains in its brief that Trooper Cooper began searching for the prosecutor at 6:00 p.m., but it was established that the basis for Trooper Fluharty interrupting the polygraph interview between 4:30 p.m. and 5:00 p.m. was that Trooper Cooper had called him about finding new evidence. Based on the testimony and

written reports in the record of Trooper Streyle, it appears that Trooper Fluharty knew at this earlier time that Trooper Cooper had begun his search for the prosecutor. Trooper Cooper also testified at the pretrial hearing that he was trying to locate the prosecutor before he learned Appellant had refused to take the polygraph "[b]ecause I felt that we had uncovered enough evidence to go ahead and charge Mr. Rush."

**17.** Trooper Cooper testified at the suppression hearing that he briefly stopped at the detachment to use the rest room or "switch cars" at different times during the day, including around 5:00 p.m.

**18.** On cross examination during the pretrial hearing, Trooper Cooper said that he probably did tell the prosecutor that he feared Appellant was going to "lawyer up." He explained his fear was "[d]ue to the fact that he had refused to take a polygraph examination, I just became more wary that he might be refusing to cooperate anymore in the matter. I felt that it was urgent for us to take a stand, if we were going to."

**19.** The tape or its transcription was not admitted into evidence during the transfer hearing; how-

Appellant indicated that his first statement given to Trooper Starcher earlier that day was not entirely true. Trooper Cooper testified that no one had informed him at that juncture Appellant had invoked his right to counsel during the pre-polygraph interview, and that had he been so informed he would not have attempted to take a statement from Appellant.

Appellant was taken before the magistrate for an initial appearance at 11:00 p.m. The criminal complaint filed at that time charged Appellant with being an accessory to murder both before and after the fact. The case proceeded in circuit court as statutorily required where it was eventually transferred from the juvenile jurisdiction to the adult criminal jurisdiction of the circuit court.

Two weeks after the arrest, another trooper received a phone call from Appellant's father. Mr. Rush reported that while emptying the trash in the bathroom of his trailer he discovered a large sum of money[20] he could not account for hidden underneath the plastic bag lining the trash can. Mr. Rush testified at trial that he could not recall whether Appellant visited the bathroom the night of the murders before the police arrived to take his son back to the scene of the crime. In a statement he gave to the investigating trooper, Mr. Rush said he could not recall whether he had emptied the trash between the night of the murders and when he discovered the money.

The September 2004 Term of the Calhoun County Grand Jury returned an eight-count indictment against Appellant charging him with two counts of first-degree murder, one count of first-degree robbery, one count of nighttime burglary, one count of grand larceny, two counts of conspiracy to commit murder and one count of conspiracy to commit robbery. Appellant's trial began on December 13 and ended on December 22, 2004. The jury returned the verdict of guilty of two counts of the lesser-included offenses of voluntary manslaughter, one count of first-degree robbery, one count of nighttime burglary and one count of conspiracy to commit robbery. Appellant moved to be sentenced

as a juvenile offender or, alternatively, that sentence be suspended and that he be confined at the Anthony Correctional Center. These motions were denied and the court sentenced Appellant on March 18, 2005, to fifteen years for each count of voluntary manslaughter, thirty-five years for first-degree robbery, one to fifteen years for burglary, and one to five years for conspiracy to commit burglary. With the exception of the conspiracy sentence, all sentences were ordered to be served consecutively. The petition for appeal was filed in this Court on October 11, 2005, and granted on March 2, 2006.

## II. Standard of Review

■ The instant appeal presents assignments of error having varying standards of review. To the extent necessary, applicable standards of review will be set forth at the outset of our discussion of a specific alleged error. We simply note at this point that "[g]enerally, findings of fact are reviewed [by this Court] for clear error and conclusions of law are reviewed *de novo*. However, ostensible findings of fact, which entail the application of law or constitute legal judgments which transcend ordinary factual determinations, must be reviewed *de novo*." Syl. Pt. 1, in part, *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 470 S.E.2d 162 (1996).

## III. Discussion

Appellant's first contention is that the lower court erred by denying suppression of all of his out-of-court statements which Appellant maintains were obtained in violation of the prompt presentment rule. Appellant asserts that he was in custody or reasonably believed he was in custody from the time that he was taken to the murder scene by the sheriff's department. Appellant's challenge, therefore, extends to the admissibility of the statements he made to Trooper Starcher, Trooper Streyle and Trooper Cooper.

■ We examine this issue under the standard of review this Court announced in

---

ever, during the trial the jury heard this taped interview and received a copy of the transcribed audio tape.

20. The amount of money found in the trash can was $2,732.

syllabus point two of *State v. Hosea*, 199 W.Va. 62, 483 S.E.2d 62 (1996), which states:

> The Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession was obtained as a result of the delay in the presentment of a juvenile after being taken into custody before a referee, circuit judge, or a magistrate when the primary purpose for the delay was to obtain a confession from the juvenile. The factual findings upon which the ultimate question of admissibility is predicated will be reviewed under the deferential standard of clearly erroneous.

Consequently, our review in this case of whether the trial court properly decided to admit some or all of Appellant's inculpatory statements is de novo.

The applicable prompt presentment rule at issue appears in West Virginia Code § 49–5–8(c)(4) (2006)[21] (2006 Supp.) as follows:

> (c) Upon taking a juvenile into custody, with or without a court order, the official shall:
>
> * * *
>
> (4) Take the juvenile without unnecessary delay before a juvenile referee or judge of the circuit court for a detention hearing pursuant to section eight-a [§ 49–5–8a] of this article: Provided, That if no judge or juvenile referee is then available in the county, the official shall take the juvenile without unnecessary delay before any magistrate then available in the county for the sole purpose of conducting such a detention hearing. In no event may any delay in presenting the juvenile for a detention hearing exceed the next day after he or she is taken into custody.

This Court addressed the meaning and consequences related to this statutory provision in syllabus point three of *State v. Ellsworth*, 175 W.Va. 64, 331 S.E.2d 503 (1985), by explaining that:

> [u]nder W.Va.Code, 49–5–8(d), when a juvenile is taken into custody, he must immediately be taken before a referee, cir-

cuit judge, or magistrate. If there is a failure to do so, any confession obtained as a result of the delay will be invalid where it appears that the primary purpose of the delay was to obtain a confession from the juvenile.

After recognizing that the underlying purpose of prompt presentment requirements is to provide meaningful protection for a defendant's constitutional rights, we stressed in *Ellsworth* that there is a heightened significance to this purpose in juvenile cases not only due to this population's immaturity but also because of the likelihood that a juvenile who commits a serious crime may be transferred to the court's criminal jurisdiction and tried as an adult. *Id.* at 69, 331 S.E.2d at 507–508. With this in mind we undertake the twofold *Ellsworth* inquiry to determine: (1) when Appellant was placed in custody, and (2) whether the primary purpose for the delay in presentment to a judicial officer was to obtain a confession.

In *Ellsworth*, we also elaborated on the meaning of the term "custody" as it is used in West Virginia Code § 49–5–8 by stating that "[i]t is apparent from this section that the term 'custody' is equivalent to an arrest, that is, it must be based upon probable cause where the juvenile is being taken into custody for an act which if committed by an adult would be a crime." *Id.* at 70, 331 S.E.2d at 509. It is well established that an arrest by a law enforcement officer of either a juvenile or adult means detaining a person "by any act or speech that indicates an intention to take ... [the person] into custody and ... subject[ ] ... [that person] to the actual control and will of the" arresting officer. Syl. Pt. 1, in part, *State v. Muegge*, 178 W.Va. 439, 360 S.E.2d 216 (1987), *overruled on other grounds, State v. Honaker*, 193 W.Va. 51, 454 S.E.2d 96 (1994); *see also* Syl. Pt. 3, in part, *State v. Preece*, 181 W.Va. 633, 383 S.E.2d 815 (1989), *overruled on other grounds, State v. Guthrie*, 205 W.Va. 326, 518 S.E.2d 83 (1999) (an arrest or custodial detention equivalent to an arrest exists when "a reasonable person in the suspect's position

---

**21.** The 1998 statutory provision in effect at the time relevant to the events in this case is the same as the current statute.

would have considered his or her freedom of action curtailed to a degree associated with a formal arrest."). Essentially, "once a defendant is in police custody with sufficient probable cause to warrant an arrest, the prompt presentment rule is ... triggered." Syl Pt. 2, in part, *State v. Humphrey*, 177 W.Va. 264, 351 S.E.2d 613 (1986). Appellant contends that the prompt presentment rule was implicated around 2:00 a.m. when the deputy drove him to the crime scene from his father's trailer, whereas the State contends that it was not until Appellant was actually arrested around 8:00 p.m. that prompt presentment issues arose. We cannot agree with either assertion.

There is no indication in the record that Appellant even subjectively felt he was under the control of an officer until he arrived at the State Police detachment when Trooper Fluharty threatened Appellant. Appellant testified that he willingly accompanied the deputy sheriff from his father's house and knew he was not under arrest. Additionally, Appellant admitted that he did not hesitate to undergo the gun residue test and had no problem with telling what happened at the Groves house to Trooper Starcher. Trooper Starcher testified as well that he informed Appellant that he was free to leave before he read the Miranda warnings to the young man and subsequently took his statement. Moreover, probable cause to arrest Appellant did not exist when Trooper Starcher interviewed Appellant.

The first time Appellant related that he believed his freedom was curtailed was when he arrived at the State Police detachment around 6 a.m. It was at this time that Trooper Fluharty told Appellant he was free to leave but, as Appellant related, as soon as he began to leave the trooper used anger and profanity to intimidate him into staying. After this incident, Appellant participated in an unrecorded two-hour interview with Trooper Fluharty and agreed to take a polygraph test.

Based upon the foregoing, we find no evidence that Appellant was in custody at the time he gave his statement to Trooper Starcher.[22] However, we believe that the record establishes that statements Appellant made to Trooper Streyle and Trooper Cooper were inadmissible on prompt presentment grounds. Any reasonable person in Appellant's position would have believed they were subject to the actual control and will of law enforcement as a result of Trooper Fluharty's intimidating behavior. Appellant testified that he indeed felt threatened when this occurred around 6:00 a.m. at the State Police Detachment on May 15, 2003. "Once such custodial arrest of a juvenile has occurred, his right to be immediately taken before a judicial officer arises under W.Va. Code, 49–5–8(d)[,]" unless the primary purpose in such delay in presentment was not to obtain a confession. *Ellsworth*, 175 W.Va. at 70, 331 S.E.2d at 509. The State bears the burden of proving that delay was not for the purpose of obtaining a confession. *In the Matter of Steven William T.*, 201 W.Va. 654, 661, 499 S.E.2d 876, 883 (1997).

The State contends that Appellant was free to leave the detachment at any time and that Trooper Fluharty even offered to take Appellant home. It is difficult to imagine that Appellant, or anyone in Appellant's shoes, would even consider trying to leave when a trooper had threatened him or her earlier for attempting to leave. It is even harder to believe that anyone would gladly accept an offer of a ride from, and in so doing being alone in a closed vehicle with, someone who had exhibited a volatile temper. It is not clear why Appellant did not call his father for a ride home, but it is clear that walking to his home was hardly an option since he lived over thirteen miles from Grantsville. Instead, Appellant stayed at the detachment and underwent two hours of questioning and complied with the request to undergo a polygraph test. As this Court has

**22.** Appellant also contends that the statement he made to Trooper Starcher was inadmissible because it was not made voluntarily. We reach a contrary conclusion after applying the two prong analysis explained in *State v. Goff*, 169 W.Va. 778, 782, 289 S.E.2d 473, 476 (1982). First, Appellant was informed of his *Miranda* rights. The officer, aware of Appellant's reading and writing deficiencies, read the rights form to Appellant before asking him to sign the form, which Appellant did without hesitation. Secondly, there is no evidence of mental or physical coercion used by the officer in obtaining either of the statements so as to find that they were "not the product of the freewill" of Appellant. *Id.* at Syl. Pt. 2.

previously recognized, a person such as Appellant with an impaired mental condition has an increased susceptibility to manipulation, influence and coercion. *State v. Goff,* 169 W.Va. at 784, 289 S.E.2d at 477. In short, the circumstances refute the State's contention that Appellant was free to leave the detachment. Moreover, there simply is no evidence that the excessive delay in taking Appellant before a judicial officer was for a reason other than to extract a confession from Appellant.

Absent proof by the State to the contrary, it appears from the totality of the circumstances in light of Appellant's juvenile status and mental impairment that the significant period of delay in this case was to elicit a confession from Appellant. Thus, the incriminating statements obtained from Appellant by Trooper Streyle at and after 2:00 p.m. and Trooper Cooper at and after 7:52 p.m. on May 15, 2003, as a result of the delay renders the statements inadmissible. The lower court's ruling to the contrary must therefore be reversed.[23]

█ The remaining error raised by Appellant which we will address [24] involves the trial court's decision to transfer this case to the court's criminal jurisdiction.[25] Relying on syllabus points one, two and three of *In the Matter of Steven William T.,* 201 W.Va. 654, 499 S.E.2d 876 (1997), we summarized our standard for reviewing orders in juvenile-to-adult-jurisdiction transfer proceedings in *In re James L.P.,* 205 W.Va. 1, 3, 516 S.E.2d 15, 17 (1999) as follows: "[W]e apply the deferential, 'clearly erroneous' standard of review to factual findings by the circuit court; we review the circuit court's legal

conclusions under the non-deferential, 'de novo' standard."

While somewhat unclear, it appears that Appellant's essential claim is that the trial court's probable cause finding is based upon the herein previously discussed statements Appellant claimed to be inadmissible and was made without adequate appreciation of Appellant's immaturity and mental deficiency.

█ The only statements of Appellant which were admitted into evidence and relied upon by the trial court during the transfer proceeding were those given to Troopers Starcher and Streyle. Even though we have found the statement given to Trooper Streyle inadmissible, we see no reason to find this flawed evidence fatal to the lower court's decision to transfer. It is only when "there are substantial defects in the transfer hearing that go to the validity of the probable cause finding ... [that] we will reverse and remand the case for a further transfer hearing." Syl. Pt. 7, in part, *In the Matter of Mark E.P.,* 175 W.Va. 83, 331 S.E.2d 813 (1985). Even without the inadmissible statement, the trial court's twenty-eight page transfer order details sufficient evidence to support the lower statutory standard of probable cause. The transfer order also reflects that due consideration was given to Appellant's age and mental disability in light of all of the evidence before it. We find no abuse of discretion and the order transferring Appellant to adult jurisdiction is, therefore, affirmed.

## IV. Conclusion

Based upon the above, the trial court's May 18, 2004, order transferring this case

---

23. Based upon this determination, there is no need to separately address whether the incriminating statements were voluntarily made.

24. In light of the disposition of this case, we find it unnecessary to address Appellant's assignments regarding trial and sentencing errors.

25. The transfer of jurisdiction in juvenile cases is addressed in West Virginia Code § 49–5–10 (2001) (Repl.Vol.2004), in which it is stated in pertinent part:
   (d) The court shall transfer a juvenile proceeding to criminal jurisdiction if there is probable cause to believe that:

(1) The juvenile is at least fourteen years of age and has committed the ... the crime of murder under sections one, two and three, article two of ... chapter [sixty-one of this code].

\* \* \*

(g) The court may, upon consideration of the juvenile's mental and physical condition, maturity, emotional attitude, home or family environment, school experience and similar personal factors, transfer a juvenile proceeding to criminal jurisdiction ....

from juvenile to criminal jurisdiction is affirmed. However, we reverse the conviction obtained in the subsequent criminal trial due to the inadmissibility on prompt presentment grounds of the statements Appellant made to law enforcement at and after 2:00 p.m. and at and after 7:52 p.m. on May 15, 2003. The case is remanded for a new trial.

Affirmed, in part, reversed, in part, and remanded.

MAYNARD, Justice, dissenting.

(Filed Dec. 4, 2006)

This case required the Court to determine whether the appellant's conviction for two counts of voluntary manslaughter, robbery, nighttime burglary, and conspiracy to commit robbery should stand. The majority opinion concluded that the appellant's convictions should be reversed due to the inadmissibility on prompt presentment grounds of the statements the appellant made to law enforcement at 2:00 p.m. and thereafter on May 15, 2003. For the reasons outlined below, I believe that the majority of this Court has made a grave error in reversing the appellant's conviction. Therefore, I dissent.

According to the majority, "there is simply no evidence that the excessive delay in taking appellant before a judicial officer was for a reason other than to extract a confession from appellant." I disagree and the record clearly contradicts that conclusion. In order to fully comprehend the majority's error it is necessary to review the facts of this case.

First, I have to point out that this was a vicious and savage homicide by the appellant without any provocation. As the sixty-nine-year-old Mr. Groves and his sixty-year-old companion, Ms. Hicks, slept in their separate bedrooms, both were killed in their sleep as they were shot at close range with a shotgun. In fact, the shotgun shell that killed Mr. Groves entered from behind his right ear, passed through his skull, destroyed his brain, and exited as it exploded through the top of his forehead. The appellant, who enjoyed a close relationship with the victims, was spending the night in the victims' home at their request. The appellant usually spent several nights per week sleeping at Mr. Groves' home and had forged a close relationship with him as he often earned money by doing chores for him. The appellant even said he considered Mr. Groves and Ms. Hicks to be friends and family members and said they were like a father and mother to him.

During the morning of the murder, it was the appellant who called 911 and concocted a story about hearing two gunshots and then the sound of a car driving away. And, even though the phones in Mr. Groves' home were in working order, the appellant drove back to his father's trailer before calling 911. His trailer was approximately one-half-mile away from Mr. Groves' home. When the Sheriff and his deputy arrived at the appellant's trailer, they asked him to return with them to the crime scene to answer some questions. There was nothing unusual about the request since the appellant was present when the shots were fired and was the only potential witness to the crime. Both the appellant and his father consented and the appellant voluntarily left with the Sheriff.

At approximately 2:00 a.m., the appellant and the Sheriff arrived back at Mr. Groves' home. Initially, the appellant waited in the back of the Sheriff's jeep and even fell asleep as the police investigated and collected evidence at the crime scene. At approximately 3:41 a.m., State Trooper Starcher read the appellant his *Miranda* rights, explained that he was not under arrest, and was free to go at any time. He then began to question him about what he knew with regard to the deaths of his friends, Mr. Groves and Ms. Hicks. Prior to answering any questions, the appellant knowingly and voluntarily waived his right to counsel. He then provided a statement to the officer.

After listening to the appellant's story about two people running from the house following two gun shots, Trooper Starcher returned to the victims' home to continue his investigation. After securing the crime scene, Trooper Starcher drove the appellant to the State Police Detachment, arriving at approximately 5:55 a.m. The appellant was once again read his *Miranda* rights and was told that he was not under arrest and was free to leave at any time. Trooper Fluharty conducted that part of the investigation. The majority opinion points out that the appellant said he felt threatened by an outburst

of Trooper Fluharty directed toward him. Trooper Fluharty, who had been a State Trooper for twenty years, denies the incident. Trooper Fluharty interviewed the appellant, but did not take a statement from him because the appellant agreed to take a polygraph test. The appellant was still not under arrest, was free to leave at any time, and was not questioned any further until the arrival of State Trooper Streyle, who was going to administer the polygraph test.

It was approximately 2:00 p.m. when Trooper Streyle arrived. Trooper Streyle read the appellant his *Miranda* rights for the third time and asked him to sign another waiver. Prior to this time, Trooper Cooper had gone to the appellant's father's home and obtained permission for Trooper Streyle to conduct the polygraph on the appellant. The officer even offered the father a ride to the State Police barracks to witness the entire polygraph and talk with his son. The appellant's father provided his signed consent, but refused to go to the police station.

After obtaining the necessary consent of the appellant and his father, Trooper Streyle began a pre-interview of the appellant to build a rapport with him. Upon completing the pre-interview, Trooper Streyle began asking the appellant questions about the murders. Soon thereafter, Trooper Fluharty entered the room and stated that they had obtained incriminating evidence on the appellant. When Trooper Fluharty left the room, the appellant said that he would not answer any further questions without counsel present. Trooper Streyle immediately ended the interview without completing the polygraph test and informed Trooper Fluharty about the appellant's request. Trooper Fluharty told the appellant he was free to leave and that he was not under arrest. He also told the appellant that he could wait until Trooper Cooper, who was trying to locate the prosecuting attorney for advice, returned to the office. The appellant said he would voluntarily remain at the State Police barracks.

Lets be clear about what happened here. The appellant voluntarily stayed at the State Police barracks even though he was offered a ride home by the State Troopers. He stayed even though he was given unrestricted access to a telephone where he could have called his father, another family member, a neighbor, or even a friend to take him home. Most importantly though, he stayed of his own free will and volition. He patiently waited at the police station for the return of Trooper Cooper without being questioned in any manner by any law enforcement officer. He walked around the office; he was allowed access to various rooms of the office without restriction; he slept for a period of time; he ate pizza; and he rested until Trooper Cooper arrived. At no time was he shackled, handcuffed, or subjected to any physical abuse. He simply waited for the return of Trooper Cooper.

Upon his return to the office, Trooper Cooper told the appellant that he was going to draft a complaint wherein he would be arrested for murder. After a brief silence, the appellant began to cry and gave a spontaneous statement saying, "I'm sorry. I loved Ward and Mary." Through this statement, it was the appellant who "evinced a willingness and a desire for a generalized discussion about the investigation" resulting in further communication, exchange, and conversation with the police. *See Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).

Trooper Cooper stopped the appellant from making any further incriminating comments and immediately read his *Miranda* warnings to him. It was the appellant who, for at least the fourth time that day, knowingly waived his right to counsel and voluntarily provided a statement to the police after initiating conversation about the substance of the case with the State Troopers. Once the appellant completed his thirty minute statement, Trooper Cooper immediately drove him to the magistrate for arraignment.

It has long been the rule of this State that it is the trial court's job to determine the facts surrounding a juvenile appellant's confession. If the trial court's factual determinations, including determinations regarding credibility, are reasonable supported by the record, this Court will not disturb them on appeal. *See In re James L.P.,* 205 W.Va. 1, 14, 516 S.E.2d 15, 28 (1999). The circuit judge specifically found that the appellant "knew and understood fully what his rights were, and that he knowingly and voluntarily

again waived those rights." The circuit judge also explained:

The "prompt presentment" rule is not invoked when a person, whether an adult or a juvenile, becomes a "suspect." It occurs when he is arrested or circumstances are such that a reasonable person would conclude that they were under arrest. This occurs when a person's freedom is deprived of them. The court is convinced that any such rule was not violated here—at least as to the oral statements made by [the appellant] to the polygraph operator—any delay was prompted by the police and [the appellant] desiring to wait for the arrival of a polygraph, and not for the purpose of obtaining a confession from [the appellant].

Again, let me be perfectly clear, this was a calculating, scheming young man who killed two people he supposedly loved. He was a frequent overnight guest in their home who had gained their trust. After reading the entire record in this case, it is clear to me that he was well aware of what he was doing each and every time he waived his right to counsel and voluntarily provided statements to the law enforcement officers. Throughout the day in question, the appellant attempted to act like a victim and shift the blame to another individual. He rolled the dice creating stories he felt would relieve him of any responsibility, but eventually his lies created a web of deceit which he was unable to untangle. Even upon his arrest and detention at the juvenile center it took him only two days before he began plotting to escape from the facility.

It is clear to me that there is nothing in the aforementioned facts that even remotely amount to a violation of the prompt presentment rule. The appellant was not under arrest prior to the return in the evening of Trooper Cooper and was free to leave at any moment. He chose not to leave. Simply put, he provided several voluntary statements to the officers before and after his arrest. Those statements were taken by competent police officers who acted in full compliance with the laws of both the United States and West Virginia. My fear is that the majority opinion has created a situation which could result in chaos and havoc on future investigations of suspects of heinous crimes. Officers will read these facts and fear that even when they follow proper police procedures that much of their evidence will become inadmissible and tainted. Another result could be the premature arrest of innocent individuals who are quickly paraded in front of magistrates as police officers scramble to avoid the appearance of violating our prompt presentment rule. Common sense needs to prevail and police officers need to be able to do their jobs without unreasonable restraints and unworkable rules. Therefore, for the reasons stated above, I respectfully dissent.

BENJAMIN, Justice, concurring.

(Filed Jan. 2, 2007)

Because the majority opinion in this case not only accurately states the facts and underlying circumstances present in this case, but also correctly applies the law, I concur. Specifically, the transfer of this case to the court's criminal jurisdiction was proper, affirmation of that transfer should have been affirmed. The conviction below, however, should be reversed on prompt presentment grounds. I specifically disagree with the dissenting opinion in this case since that opinion neglects to reference a number of matters crucial under the law of this State, including a number of highly questionable actions involving the investigation of Appellant which occurred at the State Police Detachment and Appellant's status not only as a juvenile, but specifically as a juvenile with an I.Q. between 64 and 69, who was functionally illiterate (with reading, writing and math skills at no more than the first grade level).

Appellant first accompanied law enforcement personnel to the victims' home at between 1:30 a.m. and 2:00 a.m. He remained with law enforcement personnel during their investigation of the murders of Warden Groves and Mary Hicks, until some time around 5:30 a.m. and 6:00 a.m. During this time, Appellant gave a statement to Trooper Douglas Starcher. As the majority opinion holds, there was no legal problem with this statement.

From a custody standpoint, the following hours were crucial to this case. While the dissenting opinion glosses over First Sergeant Dale Fluharty's interrogation of Appel-

lant as apparently not of importance, the facts indicate otherwise. Specifically, in response to an indication that he could leave, Appellant contended that Sergeant Fluharty, "asked me if I was getting smart with him and he would rip my F—ing head off", after which he contends he was told he could not leave the detachment.[1] Sergeant Fluharty said he did not threaten the Appellant. However, there was more in the record, not referenced in the dissenting opinion, which removes this action from the realm of "he said, he said" to leaning in favor of Appellant. Specifically, the Appellant told Sergeant Karl Streyle, a State Police polygraph tester, of the outburst. According to Sergeant Streyle, when he asked Sergeant Fluharty about his use of profanity and otherwise intimidating Appellant, Sergeant Fluharty shrugged and told Sergeant Streyle that he had no patience for interviewing any more. The record also reflects that Sergeant Fluharty later entered Sergeant Streyle's interview of Appellant very upset and told Appellant in a raised voice that new evidence had been found and warned Appellant to tell what he knew. Sergeant Streyle indicated that Appellant's demeanor changed when Sergeant Fluharty entered the room and that he appeared frightened.

Of additional importance, Sergeant Streyle indicated that the Appellant thereafter invoked his right to counsel, indicating that he wanted an attorney before he talked with anyone else. Sergeant Streyle properly stopped his interview at that point, and testified that he informed Sergeant Fluharty and Trooper Starcher of Appellant's invocation of the right to counsel and to remain silent. Again absent from the dissenting opinion is reference to Sergeant Streyle's memorandum regarding the circumstances of his time at the detachment. Specifically, Sergeant Streyle reported that he received a request from a fellow officer to omit from the routine report any mention of the Appellant asserting his right to counsel and to remain silent.[2]

At about 7:45 p.m., the Appellant was advised that he was under arrest by detach-ment commander, Sergeant Jeff Cooper, who had been away from the detachment most of the day while investigating the double murder. Notwithstanding the Appellant's invocation of his right to counsel and to remain silent, Sergeant Cooper proceeded to interview the Appellant using a tape recorder. This taped interview was used during the Appellant's criminal trial and the jury received a copy of the transcribed audio tape. The Appellant was finally taken before the magistrate for an initial appearance at 11:00 p.m.

To his credit, Sergeant Cooper later testified that he was not told that the Appellant had invoked his right to counsel and to remain silent, and that if he had been he would not have attempted to take a statement from the Appellant. Obviously, Sergeant Cooper properly understood the legal infirmities related to the State's use of this tainted interview. I must therefore disagree with the dissenting opinion that the State's use of this recorded interview was acceptable. It was not. In view of the applicable law cited in the majority opinion, and what a reasonable person in Appellant's position would have believed, the statements Appellant made to Sergeant's Streyle and Cooper were inadmissible on prompt presentment grounds. The delay was excessive under the factual circumstances of this case.

---

1. Sergeant Fluharty was apparently not recording this interrogation, so there is no record of actually what transpired during the interrogation.

2. Trooper Starcher testified that he was not told by Sergeant Streyle of the Appellant's invocation of the right to counsel and to remain silent. Sergeant Fluharty testified that Sergeant Streyle did tell him of the invocation.